PACIFIC SOUTHWEST REALTY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102605.   Promulgated October 24, 1941.

*Bayley Kohlmeier, Esq.*, and *Stuart Baron, Esq.*, for the petitioner. *E. A. Tonjes, Esq.*, for the respondent.

### OPINION.

MELLOTT: The Commissioner determined deficiencies in income tax for the calendar years 1936 and 1937 in the respective amounts of $842.75 and $13,878.81. The petition alleges that there is no deficiency for either year and that petitioner overpaid its income taxes for the year 1936 in the amount of $53,900.53. The two general questions are: (1) Whether securities issued by petitioner and designated either 6½ percent or 5½ percent cumulative preferred serial stock represented an indebtedness rather than a proprietary interest in the corporation; and (2) whether an amount paid by petitioner is deductible as taxes.

The proceeding was submitted upon a stipulation of facts with attached exhibits and the testimony of three witnesses. We find the facts to be as stipulated and, from the testimony of the witnesses, find

that the two classes of preferred stock issued by petitioner as hereinafter set out were not listed upon any stock exchange but were dealt in, in "over-the-counter" transactions, in which accrued dividends, prior to the actual declaration of a dividend, were generally taken into consideration in substantially the same manner and to the same extent as accrued interest upon bonds is usually taken into consideration upon purchase or sale. All other facts hereinafter set out are taken from the stipulation of the parties.

Petitioner is a corporation organized in 1923 under the laws of Delaware and is qualified to do business in the State of California. Its principal place of business is in Los Angeles, California, and its income tax returns for the taxable years were filed with the collector of internal revenue for the sixth district of California. Its books of account were kept and its returns of income were made on the cash basis.

Petitioner was incorporated by persons affiliated with the Pacific Southwest Trust & Savings Bank and the First National Bank of Los Angeles for the purpose of acquiring, and thereafter owning and operating, all of the real estate properties owned by the first mentioned bank and one parcel of real estate owned by the second mentioned bank, and for the further purpose of providing additional bank premises as the growth of the banks required. The principal reason for organizing petitioner was to avoid "the locking up of too great a proportion" of the capital and surplus of the banks in real estate owned by them.

The total authorized capital stock of the corporation was 100,000 shares, divided into 50,000 shares of preferred of the par value of $100 each and 50,000 shares of common with no nominal or par value. The original articles of incorporation provided for the issuance of 23 series of 6½ percent cumulative preferred serial stock, to be designated by the letters A to W, both inclusive, each series to be for the number of shares shown (ranging between 1,100 and 3,950) and to be "redeemable at their par value plus all unpaid, accrued, or accumulated dividends thereon." Such cumulative preferred serial stock could be issued as and when the board of directors should determine, but it could not be issued except for the purpose of acquiring property suitable for one or more of the purposes of the corporation. The articles of incorporation also provided:

\* \* \* The aggregate indebtedness of the corporation secured by mortgage, deed of trust, or otherwise, shall not exceed in amount Fifty per cent (50%) of the appraised value of the property subject thereto. The total amount of preferred stock of the corporation at any time outstanding shall not, together with the total bonded indebtedness of the corporation, exceed One Hundred per cent (100%) of the appraised value of the property of the corporation \* \* \*.

The 6½ percent cumulative preferred serial stock was "entitled to receive in each year out of the surplus or net profits of the business of the corporation, dividends at the rate of 6½% per annum, and no more, upon the par value of said stock from date of issue, payable quarterly &ast; &ast; &ast;." The dividends were cumulative and "if in any year or years the dividends &ast; &ast; &ast; shall not have been paid, such dividends shall be paid in full before any dividends shall be paid or set apart upon the common stock. The amount of any serial redemption of said preferred stock, if overdue, shall be paid before any dividends shall be paid or set apart on the common stock."

In the event of liquidation, dissolution, or winding up of the corporation, the holders of the preferred stock were entitled, before any distribution could be made to the holders of the common stock, "to be paid out of the surplus profits &ast; &ast; &ast;, or in case such profits shall be insufficient, then from the general assets of this corporation, an amount equal to 105% of the par value of said stock." Upon the maturity date specified in each series the shares were to "be redeemed at par, plus unpaid, accrued, and accumulated dividends thereon &ast; &ast; &ast;." In the event the corporation should fail to redeem the stock at such time and place, the holders were to "have the right to enforce payment of the par value of said stock so agreed to be redeemed, together with the amount of any unpaid, accrued, or accumulated dividends thereon, the same as on any unconditional claim or debt against the corporation &ast; &ast; &ast;." The preferred stock was to have no voting power, the sole voting rights being vested in the holders of the common stock. In the event that any dividend on the preferred stock should not be paid when payable and should remain unpaid for ninety days, then so long as such dividend or any part thereof should remain unpaid, the issued and outstanding preferred stock was to be exclusively entitled to the voting power.

All of the common stock of petitioner, except directors' qualifying shares, was issued to the First Securities Co., an affiliate of petitioner. All of the stock of First Securities Co. and all of the stock of the two banks above named was owned by the Los Angeles Trust & Safe Deposit Co. as trustee in trust for the benefit of the owners of beneficial certificates issued by the trustee. All of the stock of the trustee was likewise owned by the First Securities Co.

Pursuant to the original articles of incorporation during the years 1923, 1924, and 1925 petitioner issued and sold 6½ percent cumulative preferred serial stock of the total par value of $4,500,000 in 23 series designated A to W, inclusive. Series A matured and became payable on July 1, 1929, and one of the remaining series matured and became payable on July 1 of each year thereafter to and including the year 1951. The certificates were redeemable at par "plus all unpaid, ac-

crued, or accumulated dividends thereon", and entitled the owners "to receive in each year out of the surplus or net profits of the business of the corporation, dividends at the rate of 6½% per annum, and no more, upon the par value of said stock from date of issue  *  *  *." The certificates also contained the essence of article fourth of the original articles of incorporation, including the provisions quoted above. During the years 1924 and 1925 petitioner also issued and sold its 5½ percent coupon bonds of a total face value of $3,000,000. The proceeds derived from the sale of the preferred stock and bonds were used for the purchase of real estate suitable for the purposes of the corporation.

In connection with the issuance and sale of petitioner's 6½ percent cumulative preferred serial stock in 1923 a prospectus was published by the First Securities Co. Therein it was stated that petitioner proposed to issue at that time $3,000,000 of 5½ percent first mortgage bonds and $3,000,000 6½ percent cumulative preferred stock and to hold in its treasury the balance of the authorized preferred stock for issuance from time to time as the needs of the company should require. The prospectus also stated: "it is the intention of the Realty Company [petitioner] to finance its present needs by equal amounts of Preferred Stock and Bonds  *  *  *. The annual maturities of bonds and stocks will serve to increase the original equity as the different series mature and are retired", and "The 6½% Cumulative Preferred Serial Stock is, in opinion of counsel, free from the Personal Property Tax in California and likewise free from the Normal Federal Income Tax."

Series A of the 6½ percent cumulative preferred serial stock matured and was redeemed on July 1, 1929. Series B to G, inclusive, matured and were redeemed respectively on July 1 of each year thereafter to and including 1935. At the beginning of the year 1936 6½ percent cumulative preferred serial stock of a total par value of $3,766,500 was issued, outstanding, and unmatured. During the year 1936 all of said securities were redeemed and retired. During the year 1936 petitioner made payments to the holders of said 6½ percent cumulative preferred serial stock at the rate of 6½ percent per annum of the par value thereof, or $65,300.63 as provided in the certificates.

At the time the securities referred to above were issued petitioner had a lease agreement with the Pacific Southwest Trust & Savings Bank under which the bank had obligated itself to pay as rental a sum which, with the other income of petitioner, would be sufficient to pay all of petitioner's operating expenses and in addition all interest, dividend, and amortization charges on its outstanding bonds and preferred stock. The bank, as lessee, agreed to pay petitioner $420,000

per annum for said property, the term of the lease being 30 years from and after July 1, 1923.

On December 16, 1927, petitioner's articles of incorporation were amended. A copy of article fourth as amended is attached to the stipulation of facts. There were no substantial changes made with respect to preferences, privileges, and other rights of the holders of preferred stock, but the amended article provided for a total authorized capital stock of 125,000 shares, divided into 75,000 shares of preferred stock of the par value of $100 each and 50,000 shares of common stock having no nominal or par value. During the year 1928, pursuant to the authority contained in the article as amended, petitioner issued and sold its securities designated 5½ percent cumulative preferred serial stock of the total par value of $1,000,000. The proceeds derived therefrom were used for the purchase of real estate suitable for the purposes of the corporation. The certificates were issued in 22 series designated AA to VV, inclusive, payable on July 1, 1939, and successively thereafter on July 1 of each year to and including the year 1960. Each certificate recited that on April 20, 1928, the board of directors "determined upon the issuance of $1,000,000 (10,000 shares) fixed dividend rate, 5½%, fixed redemption premium, 2% ($102.00 per share), designations and maturities as follows: [Schedule]."

The prospectus issued in connection with the 5½ percent cumulative preferred serial stock stated:

With the completion of the present stock sale, the Pacific Southwest Realty Company will have outstanding $4,500,000 6½% Cumulative Preferred Serial Stock, and $1,000,000 5½% Cumulative Preferred Serial Stock, in addition to 50,000 shares Common Stock of no par value, owned by the First Securities Company.

With the completion of the present financing on or about July 2, 1928, there will be outstanding $5,100,000 of first mortgage bonds. The aggregate total par value of outstanding preferred stocks and bonds will then be $10,600,000.

The prospectus also stated that the stock being offered was, "in opinion of counsel, free from the Personal Property Tax in California and likewise free from the Normal Federal Income Tax."

During the year 1936 all of the 5½ percent cumulative preferred serial shares of the par value of $1,000,000 were outstanding. All of them were redeemed and retired during the year 1937. During the years 1936 and 1937 petitioner made payments to the holders of said securities as provided in the certificates at the rate of 5½ percent of the par value thereof or $55,000 during the year 1936 and $41,250 during the year 1937.

The payments made by petitioner to the holders of its 6½ percent cumulative preferred serial stock and 5½ percent cumulative preferred serial stock were authorized by resolutions of the board of directors

of petitioner. A true copy of one of the resolutions is attached to the stipulation. It declares a "regular quarterly dividend of $1.37½ a share on the 5½% Cumulative Preferred Serial Stock of this corporation, amounting to $13,750 * * * out of the earned surplus of the corporation" and directs "that the amount thereof be set aside and transferred to 'Dividend Declared' account."

The 5½ percent cumulative preferred serial stock had been sold by the petitioner at discounts of $3 and $5 per $100 par value, the discount aggregating $46,858. It is stipulated that if the discount at which said securities were sold was a deductible expense, it was an expense which it was proper to amortize and deduct over the life of the securities and $1,833.26 of said discount expense was properly allocable to the year 1936 and $31,275.39 was properly allocable to the year 1937.

During the year 1936 petitioner redeemed and retired all of its then outstanding 6½ percent cumulative preferred serial stock for the face value thereof ($3,766,500) plus a total premium of $182,025. During the year 1937 it redeemed and retired all of its then outstanding 5½ percent cumulative preferred serial stock for the face value thereof ($1,000,000) plus a total premium of $20,000.

During the year 1929 petitioner sold certain real property located in the city of Los Angeles, California, under a conditional sales contract. Under the provisions of the contract petitioner retained title to the property until the purchase price was paid. On November 15, 1935, by reason of the default of the purchaser of the property, petitioner canceled the sales contract and repossessed the property. At the time the property was repossessed by petitioner there were assessed but unpaid property taxes against it in the amount of $5,618.35. These taxes were payable one-half on or before December 5, 1935, and one-half on or before April 20, 1936. During the year 1936 petitioner paid said property taxes in full. Petitioner deducted said sum of $5,618.35, under the provisions of section 23 (c) of the Revenue Act of 1936, in computing its net taxable income for the year 1936.

In its income tax return for the year 1936 petitioner failed to take deductions for the payments made on its securities designated 6½ percent cumulative preferred serial stock and 5½ percent cumulative preferred serial stock, failed to take deduction for the portion of the discounts at which its securities designated 5½ percent cumulative preferred serial stock were issued and sold which was allocable to the year 1936, and failed to take a deduction for the premium paid upon the redemption of its securities designated 6½ percent cumulative preferred serial stock. In its income tax return for the year 1936 petitioner reported net taxable income in the amount of $562,740.52 and a tax liability in the amount of $83,251.08. Petitioner paid this tax in installments as follows: $20,812.77 on March 15, 1937, and like

amounts on June 12, September 13, and December 13, 1937. Petitioner's return for the year 1936 was filed on March 15, 1937.

Upon examination of petitioner's income tax return for the year 1936 the Commissioner disallowed the deduction taken by petitioner for real estate taxes in the amount of $5,618.35 and determined the net income of petitioner for the year 1936 to be $568,358.87. The deficiency for the year 1936 in the amount of $842.75 resulted from the disallowance of said deduction and the consequent increase in petitioner's net income. In redetermining petitioner's net income for the year 1936 the Commissioner did not allow any deductions for the payments made by petitioner during said year on its securities designated 6½ percent cumulative preferred serial stock and 5½ percent cumulative preferred serial stock, did not allow a deduction for any portion of the discount at which petitioner's securities designated 5½ percent cumulative preferred serial stock were issued, and did not allow a deduction for the premiums paid by petitioner upon the redemption of its securities designated 6½ percent cumulative preferred serial stock.

On March 6, 1940, petitioner filed with the collector of internal revenue for the sixth district of California, at Los Angeles, California, its written claim for refund of income taxes overpaid by it for the year 1936 in the amount of $53,900.53, setting forth therein the same facts and grounds herein alleged and relied upon. A true copy of said claim for refund is attached to the petition herein.

In its income tax return for the year 1937 petitioner deducted as interest paid the payments made on its securities designated 5½ percent cumulative preferred serial stock in the amount of $41,250, deducted the sum of $31,275.39 as the portion of the discount at which said securities were issued and sold which was properly allocable to the year 1937, and deducted the premium paid in the amount of $20,000 upon the redemption of the securities. The Commissioner refused to allow these deductions.

On May 22, 1940, petitioner paid to the collector of internal revenue for the sixth district of California the deficiencies in income taxes proposed to be assessed against it for the years 1936 and 1937. The payments were as follows: $842.75 tax and $161.09 interest, or a total payment of $1,003.84 for the year 1936, and $13,878.81 tax and $1,820.21 interest, or a total payment of $15,699.02 for the year 1937.

Petitioner contends that the securities designated 6½ percent or 5½ percent "Cumulative Preferred Serial Stock" were not what they purported to be—evidence of a proprietary interest in the corporation—but that collectively they represented an obligation of the corporation to make repayment to the holders and in the meantime to pay them interest. It therefore argues that it is entitled to deduct, as interest, the amounts paid under and pursuant to the corporate resolutions as

dividends. It also contends that it is entitled to deduct the portion of the discount properly allocable to the year 1936 and the premium paid during each of the years in connection with the redemption of the two classes of stock. Inasmuch as the latter deductions are proper if the securities were in fact obligations and the amount paid was interest (art. 22 (a)–18, Regulations 94), the three contentions may be considered together.

Numerous cases have been decided by the courts or this Board involving the same general question. None of them attempt to lay down any "comprehensive rule by which the question presented may be decided in all cases, and 'the decision in each case turns upon the facts of that case'." *Proctor Shop, Inc.*, 30 B. T. A. 721, 725, and cases cited. "If it be shown that dividends paid are, according to the intent of the parties, in fact interest, and the stock on which the dividends are paid is merely held by the creditor as security, it makes no difference what the reason was for paying in that form. The courts look to the real character of the payment * * *." *Wiggin Terminals, Inc.* v. *United States*, 36 Fed. (2d) 893, 898, quoted with approval by the Circuit Court of Appeals for the Ninth Circuit in affirming the decision of the Board in *Proctor Shop, Inc., supra;* 82 Fed. (2d) 792. Cf. *Bolinger-Franklin Lumber Co.*, 7 B. T. A. 402; *Commissioner* v. *O. P. P. Holding Corporation*, 76 Fed. (2d) 11, affirming *O. P. P. Holding Corporation*, 30 B. T. A. 337; *Jewel Tea Co.* v. *United States*, 90 Fed. (2d) 451; *Helvering* v. *Richmond, F. & P. R. Co.*, 90 Fed. (2d) 971, affirming *Richmond, Fredericksburg Potomac Railroad Co.*, 33 B. T. A. 895; *Brush-Moore Newspapers, Inc.*, 37 B. T. A. 787; *Commissioner* v. *Palmer, Stacy-Merrill, Inc.*, 111 Fed. (2d) 809, affirming *Palmer, Stacy-Merrill, Inc.*, 37 B. T. A. 530; and *Commissioner* v. *Schmoll Fils Associated, Inc.*, 110 Fed. (2d) 611, reversing *Schmoll Fils Associated, Inc.*, 39 B. T. A. 411.

It is true, as petitioner points out upon brief, that the cited cases establish some general principles—the name given by the parties to a particular security or to the payments made thereunder is not conclusively determinative; the true nature and character are to be determined not only from the terms and conditions of the security, but also from a consideration of all the facts and circumstances surrounding its issuance, including evidence *aliunde* the contract; and in every case the basic difference between the relationship of corporation and stockholder on the one hand and debtor and creditor on the other must always be kept in mind. We therefore examine the evidence and the stipulated facts in the light of these principles.

The only evidence *aliunde* the contract in the instant proceeding is that upon which we have based our finding to the effect that generally, in the purchase and sale of the certificates, dividends, though not de-

clared, were taken into consideration in substantially the same manner and to substantially the same extent as accrued interest upon bonds is usually taken into consideration upon purchase and sale. There was no evidence, as in *Proctor Shop, Inc.*, and some of the other cited cases, indicating either that the issuing company desired to borrow money or that the holders were unwilling "to stand in the relation of a stockholder to the corporation." The facts show quite the contrary. The letter sent to prospective purchasers of the preferred stock, inviting them to subscribe for it, advised that the company proposed to finance its "present needs through the issuance of approximately equal amounts of preferred stock and bonds." The enclosed prospectus contained the same general statement, each indicating that the initial capital was to be obtained by borrowing 50 percent of the necessary amount through the issuance of bonds, while the remainder was to be obtained through the sale of preferred stock. This plan was carried out and $3,000,000 of each was issued and sold. Both were later increased, so that prior to April 1, 1928, the company—in the language of its second prospectus—"had  *  *  *  sold for cash to institutions and investors an aggregate of $5,000,000 First Mortgage 5½% Bonds and $4,500,000 6½% Cumulative Preferred Serial Stock." At that time $985,000 of its bonds had been retired. Then it was that the company decided to amend its articles of incorporation to permit it to issue $1,000,000 5½ percent cumulative preferred serial stock so that "with the completion of the present stock sale" there would be, as there ultimately were, $5,500,000 outstanding cumulative preferred serial stock and $5,100,000 of first mortgage bonds.

The facts referred to above indicate that petitioner intended the holders of the certificates to become, and to be, stockholders rather than creditors. It is apparent from the articles that petitioner never intended to "borrow" more than 50 percent of its funds. Thus it is stated: "The aggregate indebtedness of the corporation secured by mortgage, deed of trust, or otherwise, shall not exceed in amount Fifty per cent (50%) of the appraised value of the property subject thereto. The total amount of preferred stock of the corporation at any time outstanding shall not, together with the total bonded indebtedness of the corporation, exceed One Hundred per cent (100%) of the appraised value of the property of the corporation." If the preferred stock be held to be indebtedness, "secured by mortgage, deed of trust *or otherwise*", and unless the appraised value of the property was greatly in excess of its actual cost, which we hesitate to assume, then this provision of petitioner's charter was violated; for while the aggregate of the admitted bonds, plus the "so-called" preferred stock was $10,600.000, "the aggregate cost of the Company's properties includ-

ing those heretofore owned with those now being purchased, and including the new buildings which have been erected, [according to the prospectus] will be in excess of $11,200,000."

Moreover, there are several other circumstances which collectively convince us that both the issuing corporation and those who ultimately became holders of the securities intended that the relationship between them was to be that of corporation and stockholder rather than debtor and creditor. Each prospectus contained in its heading, in bold type, "In opinion of counsel, exempt from Normal Federal Income Tax," and a more detailed statement to the same effect in the body of the document. No evidence was introduced to show whether the holders of the securities so treated the income derived from the securities— i. e., as dividends and subject only to surtax (see for example section 25, Revenue Act of 1928)—but it may be assumed, in the absence of any proof to the contrary, that they relied upon the statements contained in the prospectuses. In any event it is not wholly without significance that petitioner treated the payments as dividends upon its books and in all of its returns of income prior to 1937. Manifestly the representation that the income was "free from Normal·Federal Income Tax" would be true only if the securities were preferred stock. In determining whether they were, or were not, what they purport to be, we must look, not only to the language of the certificates, but to the articles and amended articles of incorporation. They specify, in considerable detail, not only that preferred stock be issued, but also require that "Before the issuance of any such stock, the President of the Corporation shall file a certificate in the office of the corporation setting forth in detail the property purchased or to be purchased with the proceeds of the sale of such stock." The stock so issued was to "be entitled to receive in each year out of the surplus or net profits of the business of the corporation, dividends at the fixed dividend rate" specified in the certificates. If in any year "the dividends" on such stock have not been paid "such dividends shall be paid in full before any dividends.shall be paid or set apart upon the common stock." The use of the word "dividends" many times in the articles of incorporation and the requirement that payment of such be made "out of the surplus or net profits" can not be ignored. Wholly absent from the articles is any requirement that the annual payments upon the certificates be made regardless of earnings, except for the provisions which we shall now discuss and upon which petitioner places its chief reliance.

Each series was to "be redeemed at par, plus unpaid, accrued, and accumulated dividends thereon." "In the event that the corporation shall fail to redeem * * * at such time and place, the holders

thereof shall have the right to enforce payment of the par value of said stock so agreed to be redeemed, together with the amount of any unpaid, accrued, or accumulated dividends thereon, the same as on any unconditional claim or debt against the corporation * * *." "In the event of any liquidation, dissolution, or winding up of the corporation, * * * the holders .* * * shall be entitled, before any distribution shall be made to the holders of the common stock, to be paid out of the surplus profits arising from the business of this corporation, and then remaining intact, or in case such profits shall be insufficient, then from the general assets of this corporation, an amount equal to 105% of the par value of said stock." These provisions, petitioner contends, make the securities an "indebtedness." Respondent denies that they have any such effect, points out that the right to enforce the payment as an unconditional claim or debt appears to be limited to the holders of any series then in default, which, so far as this record shows, never occurred, and argues that "the interest of any person in the assets of a corporation must necessarily be either as a creditor or as a proprietor", but can not be both at the same time.

In practically every case decided by the courts or this Board it has been pointed out that each case must be decided on its own particular facts. *Dayton & Michigan Railroad Co.*, 40 B. T. A. 857; *Trianon Hotel Co.*, 44 B. T. A. 1073. "The authorities afford us no very certain guide in solving the difficult problem before us, but vary with the particular facts of each case." *Commissioner* v. *Schmoll Fils Associated, Inc.*, *supra*. Many facts and circumstances in the instant proceeding indicate that the corporation and the purchasers of the securities intended that the relation should be proprietary rather than that of a creditor and debtor. Some of the significant facts and circumstances upon which we have relied in reaching our conclusion have already been referred to. Others are: The name given to the securities by petitioner in its articles of incorporation, in its letters and prospectuses, and in the securities themselves. While the name given is not determinative, it should not lightly "be assumed that the parties have given an erroneous name to their transaction." *Schmoll Fils Associated, Inc.*, *supra;* *I. Unterberg & Co.*, 2 B. T. A. 274; *Kentucky River Coal Corporation*, 3 B. T. A. 644; *H. R. DeMilt Co.*, 7 B. T. A. 7. There is no evidence in the record indicating that either petitioner or the holders prior to the taxable years ever contended that there was any misnomer. Nor should it be overlooked that the certificates specifically referred to the holders as "stockholders" and to the payments as "dividends", that no payments were ever made except following the declaration of a dividend, and that all payments were made from profits. The dividends, after declaration, were set aside and transferred to "dividend declared" account.

*Meridian & Thirteenth Realty Co.*, 44 B. T. A. 865, decided since briefs were filed in the instant proceeding lends some support to petitioner's contention. It was there held that a security designated preferred stock, having a fixed maturity date, and requiring the payment of the agreed 6 percent regardless of profits represented an indebtedness. The proceedings are distinguishable in that in the cited case there was no evidence that any bonds had been issued by the corporation or that it had any other outstanding evidence of debt; a conclusion that the securities were in fact obligations did not require a holding that the corporation had violated its articles of incorporation; no representations were made that the securities were free from the normal Federal income tax; the company had not represented in connection with the issuance of such stock that it proposed to finance its needs through the issuance of equal amounts of preferred stock and bonds; and the issuing company had not, as in the instant proceeding, given the holders of the preferred stock a right to vote in the event of default in the payment of dividends, though withholding from the bondholders such privilege. Moreover, we think it is quite doubtful, in spite of the provision contained in the articles of incorporation and in the certificates purporting to give the holders of the preferred stock rights which they might enforce as creditors, that any such rights could be enforced under the stipulated facts to the detriment of general creditors or bondholders.

We are of the opinion and hold that the securities were what they purported to be. Compare *Brown-Rogers-Dixson Co.* v. *Commissioner* (C. C. A., 4th Cir.), 122 Fed. (2d) 347. It follows that the respondent committed no error in denying the claimed deductions for interest, discount, and premiums.

The petitioner's next contention is that it is entitled to a deduction of $5,618.35, for real estate taxes paid by it in 1936. The amount in question was assessed on May 1, 1935, when the real estate was in the possession of petitioner's vendee under the conditional sales contract. Petitioner repossessed the property on November 15, 1935, the vendee having defaulted in the payment of the purchase price. The taxes were payable one-half on or before December 5, 1935, and one-half on or before April 20, 1936. Petitioner paid the entire amount during 1936 and in its income tax return for that year claimed a deduction in that amount as "taxes." Respondent disallowed the deduction on the ground that the amount paid constituted additional cost of the property repossessed.

The petitioner contends that it was the legal owner of the property and, as such, legally responsible for the payment of the taxes at the time of assessment. It argues, therefore, that it should be allowed the deduction since the amount represented taxes paid after, but which

accrued before, repossession of the property. In support of its contention it cites and relies upon two unreported memorandum decisions of this Board wherein lessors of property were allowed to deduct taxes assessed during the time repossessed property was in the possession of the lessees. The conclusion that a lessor may deduct the taxes paid by him upon his property, notwithstanding the fact that a lessee may have covenanted to pay them as part of the consideration for the occupancy of the property, is not particularly helpful in determining the question now before us.

Respondent concedes that petitioner retained the legal title to the property which it sold in 1929. He takes the position, however, that it was a bare, naked legal title; that the equitable title was in the purchaser from the time of the sale in 1929; that it remained in him until the property was repossessed by the petitioner in November 1935; and that petitioner, having sold the property, had no alternative except to give the purchaser legal title upon payment of the agreed purchase price. He therefore contends that petitioner was holding the legal title to the property more in the nature of a trustee for the benefit of the purchaser than as an owner of the property as that term is ordinarily understood. He insists that, inasmuch as the taxes in question were assessed and became a lien against the property in March 1935, petitioner was paying an obligation, or an accrued liability, of its vendee when it, in 1936, paid the 1935 real estate taxes.

The parties have stipulated that the property was sold by petitioner during 1929 under a conditional sales contract. The contract was not introduced in evidence. A "conditional sale" has been defined to be a contract for the sale of property under which possession is delivered to the buyer, but title is retained in the seller until the performance of some condition, usually the payment of the purchase price. 55 C. J. 1192. The rights of the vendor and vendee under such a contract have been discussed by the courts of California in a number of cases. In *Oaks* v. *Kendall*, 73 Pac. (2d) 1255; 23 Cal. App. (2d) 715, the court pointed out that the vendor under such a contract retains an absolute right to hold the property as security for the payment of the purchase money according to the express terms of the contract, and quoted with approval the following excerpt from 25 California Jurisprudence, p. 762, sec. 930:

* * * In the ordinary executory contract for the sale of real property the vendor retains title as security for the payment of the purchase money and as trustee for the purchaser, who has only an equitable estate in the land. The position of the vendor is similar in some respects to that of a mortgagee. He has no greater rights than he would possess if he had conveyed the land and taken back a mortgage for unpaid purchase money, or than is held by a mortgagee who takes for his security a conveyance absolute in form instead of a formal mortgage, except that he is not restricted to a remedy by foreclosure. A

vendor is frequently said to have a lien on the property so long as he retains title, though properly speaking he has no lien, nor any need of one, since he has the complete legal title which he holds as a pledge for payment of the purchase money.

In *San Diego County ex rel. Whelan* v. *Davis*, 33 Pac. (2d) 827, involving the question of liability for property tax on an automobile, the Supreme Court of California, per curiam, said:

The tax must be levied on the owner of the property, but this does not necessarily mean the holder of the legal title. In a conditional sale, the title in the seller is for security only, to assure the payment of the purchase price. It carries with it none of the ordinary incidents of ownership. The buyer has the possession and use of the property to the complete exclusion of the seller subject only to the seller's remedies in case of default. Both in a practical and a legal sense the buyer is the beneficial owner.

In Thompson on Real Property, vol. 5, sec. 4526, the author states: "There can be no sensible distinction between the case of a legal title conveyed to secure the payment of a debt and a legal title retained to secure payment." While there are some points of difference between the relation of vendor and vendee under a conditional sales contract and that of equitable mortgagee and mortgagor where the vendee holds an equity which is subject to foreclosure by the vendor, we do not think the difference is of such a substantial nature as to warrant the allowance of a deduction for taxes when paid by the vendor after the property is repossessed although such allowance would not be granted following foreclosure of the mortgage by the equitable mortgagee.

Under the laws of California, the liability for county and city taxes is determined by the ownership of property on the first Monday in March. *California Sanitary Co., Ltd.*, 32 B. T. A. 122; *Crown Zellerbach Corporation*, 43 B. T. A. 541 (on appeal C. C. A., 9th Cir.). (Sec. 3628, Political Code of California.) Petitioner's vendee was the beneficial owner and had possession and control of the property on that date, and thus became liable for the payment of the real estate taxes here involved. Petitioner's payment of such taxes in 1936, after it had repossessed the property in November of 1935, does not in our opinion make such taxes its taxes or entitle it to the claimed deduction. Cf. *Commissioner* v. *Coward*, 110 Fed. (2d) 725; *Lifson* v. *Commissioner*, 98 Fed. (2d) 508; certiorari denied, 305 U. S. 662; *Estate of Lucy S. Schieffelin*, 44 B. T. A. 137; *Helvering* v. *Missouri State Life Insurance Co.*, 78 Fed. (2d) 778; *John Hancock Mutual Life Insurance Co.*, 10 B. T. A. 736.

Finding no error in the deficiencies determined by the respondent, they must be approved. It follows that petitioner's claim for overpayment can not be allowed.

*Decision will be entered for the respondent.*