MERIDIAN & THIRTEENTH REALTY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 101968. Promulgated July 3, 1941.

*Lucien L. Dunbar, Esq.,* and *Merlin M. Dunbar, Esq.,* for the petitioner.

*John D. Kiley, Esq.,* for the respondent.

---

[3] E. g., Revenue Act of 1932, sec. 1111.

MURDOCK: The Commissioner determined a deficiency of $2,910.06 in the income tax of the petitioner for the calendar year 1936. Two issues are presented for decision: (1) Whether the Commissioner erred in failing to allow a deduction of $1,800 for interest paid on so-called preferred stock, and (2) whether the petitioner is entitled to a credit under section 26 (c) (1) or (c) (2) equal to adjusted net income in determining undistributed net income. The parties have stipulated all of the facts which they deem material and the Board adopts the stipulation as its findings of fact. The testimony of one witness was introduced, but no findings have been made based upon his testimony, since the parties requested none.

The petitioner was incorporated in November 1922, under the laws of Indiana, solely for the purpose of acquiring, owning, improving, and renting a certain piece of property in the city of Indianapolis. It was without power to transfer or encumber the property except with the written consent of the preferred stockholders. Its authorized capital stock consisted of 2,000 shares of common stock and 2,250 shares of preferred stock, each share having a par value of $100. The petitioner agreed to redeem each share of preferred stock on a fixed date at par value, plus accumulated dividends, and it reserved the right to redeem at an earlier date by the payment of a premium. Each share of preferred stock became immediately redeemable upon failure of the petitioner to comply with any of its obligations and agreements with respect thereto and, if the petitioner should fail upon demand to redeem the same with accrued dividends, then the holder thereof became entitled to require the liquidation of the company. The holder of each share of preferred stock was entitled to receive cumulative dividends at the rate of 6 percent per annum, payable in equal quarterly installments. No amount could be set aside for or paid to common stockholders until all current obligations on the preferred stock had been met.

All of the preferred stock was sold under an underwriting agreement with Wild & Co. dated November 13, 1922. The agreement recited that the petitioner was about to acquire the real estate and to erect a building thereon to cost approximately $250,000, and desired the assistance of Wild & Co., party of the second part, in financing the cost of the improvements. The petitioner was to issue all of its common and preferred stock. The agreement recited the conditions for the retirement of the preferred stock and the payment of dividends thereon. The majority of the common stock was to be delivered to nominees of the party of the second part so long as any of the pre-

ferred stock should be outstanding, so that the nominees could vote the stock whenever and so long as the petitioner should be in default in the performance of any of its obligations to its preferred stockholders.

The agreement further provided that the petitioner should obtain a lessee, approved by the second party, to join in a lease of the premises "for the period from January 1, 1923, to and including January 1, 1937, at a rental at least sufficient to pay all dividends on said preferred stock and all installments of the principal thereof at the times fixed therefor, all taxes levied or imposed on the first party or upon its property by whatever authority, all insurance premiums and all costs, charges and expenses whatsoever, of said Realty Company to the end that said Realty Company shall at all times have available net revenue ample to meet all of its obligations to its preferred stockholders as the same shall become due."

The agreement also contained the following provisions:

8. So long as any of said preferred stock shall remain outstanding, said Realty Company shall:

(a) Pay no salaries to its officers and no dividends on its common stock, except after there has been first set aside, as surplus, an amount equal to the preferred stock obligations for the next succeeding twelve months;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) Not transfer, convey or encumber said real estate;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(g) Not incur, after the completion of said new improvements, any floating indebtedness in excess of $5,000.00 other than for current taxes and municipal assessments not delinquent.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The second party agreed to purchase, subject to the performance of all of the terms of the agreement, all of the preferred stock of the par value of $225,000 at 95 percent of the par value thereof, to pay out the proceeds for the erection of the new building, and to pay 3 percent interest on all undue balances of the proceeds from January 1, 1923.

All of the preferred stock was thus issued. Thereafter, the quarterly dividends were regularly paid and the stock was retired in accordance with the terms of the certificates and the agreement. Preferred stock having a par value of $30,000 was outstanding at the beginning of the taxable year 1936 and was all to be retired on January 1, 1937. "Dividends" in the amount of $1,800 were paid on that stock during 1936 and $20,000 par value of that stock was retired on December 31, 1936, leaving 100 shares of the par value of $10,000 outstanding at the close of 1936. That $10,000 par value was to be retired in accordance with the terms of the stock and agreement on January 1, 1937, and was actually retired on March 4, 1937.

The first question is whether the preferred stockholders made investments in the petitioner so that the payment of $1,800 to them in the taxable year was a dividend, or whether they made loans to the corporation upon which it paid them interest at the rate of 6 percent. All such questions have to be decided upon the facts in the particular case. *Dayton & Michigan Railroad Co.*, 40 B. T. A. 857. There are certain facts in this case which must be given due consideration but do not serve to determine the issue. These include, on the one hand, the use of the words "preferred stock" and "dividends", the subordination of the rights of the preferred stockholders to those of general creditors, and, on the other hand, absence of voting rights in the preferred stock. *Commissioner* v. *O. P. P. Holding Corporation*, 76 Fed. (2d) 11; *Wiggin Terminals, Inc.* v. *United States*, 36 Fed. (2d) 893; *Commissioner* v. *Proctor Shop, Inc.*, 82 Fed. (2d) 792, affirming 30 B. T. A. 721. But this preferred had other and more significant characteristics. Each share had a fixed maturity date upon which it became payable; the common was held by nominees for the protection of the preferred; the holder of a share of preferred could enforce payment of the entire sum due as a debt in case of default; and the payment of the 6 percent was not dependent upon profits, but was payable and could be demanded in any event. The fact that the 6 percent was payable even in the absence of profits is shown by the following provision of the articles of association and by a similar provision printed on the certificates:

On liquidation of the Company, the holders of the shares of preferred stock shall be entitled to receive the par value of such shares, plus all accumulated dividends, and no more, before any sum whatever shall be paid upon the common stock.

The so-called preferred stock actually represented an indebtedness and the $1,800 paid thereon in 1936 was interest. *United States* v. *South Georgia Railway Co.*, 107 Fed. (2d) 3; *Commissioner* v. *O. P. P. Holding Corporation, supra; Palmer, Stacy-Merrill, Inc.* v. *Commissioner*, 111 Fed. (2d) 809, affirming 39 B. T. A. 636; *Jones Syndicate* v. *Commissioner*, 23 Fed. (2d) 833; *Richmond, Fredericksburg & Potomac Railroad Co.*, 33 B. T. A. 895; affd., 90 Fed. (2d) 971.

The petitioner next claims that it is entitled to a credit under section 26 (c) (1), which relates to contracts restricting payment of dividends and allows credit of "An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends." The petitioner relies upon the underwriting contract dated November 13,

1922. That contract was written, was executed by the corporation prior to May 1, 1936, and contains provisions expressly dealing with the payment of dividends. The issue is thus narrowed to the question of whether the petitioner could have distributed any amount as a dividend in 1936 without violating the provisions of that contract.

The contract contained a provision that so long as any preferred stock remained outstanding the company could pay no dividends on its common stock, "except after there has been first set aside, as surplus, an amount equal to the preferred stock obligations for the next succeeding twelve months." Three hundred shares of preferred stock of the par value of $30,000 were outstanding during most of 1936. The obligation of the petitioner was to retire those shares by January 1, 1937, and to pay the quarterly dividends thereon. If it could not declare a dividend on its common stock during 1936 except after it had first set aside *from income of 1936* an amount equal to the preferred stock obligations for the next succeeding twelve months, then it is entitled to the credit which it claims, since its income for 1936 was less than $30,000.

The petitioner at the beginning of 1936 had a surplus, accumulated from earnings of prior years, in the amount of $116,174.11, which it increased to $133,475.88 at the close of 1936 by adding some of the earnings of 1936. The respondent argues that this surplus was far in excess of the obligations on the preferred stock for the next succeeding twelve months and, therefore, the petitioner could have paid a taxable dividend on the common stock without violating the terms of the contract. He says it could have paid a cash dividend in the amount of $10,906 by using cash on hand at the end of 1936 in the amount of $5,906.62 and by borrowing $5,000, as permitted under the contract. He is not concerned about a dividend payable in common stock, since that would not be taxable to the common stockholders, but he says a taxable dividend of preferred stock could have been distributed to the common stockholders and in this way all of the earnings of 1936 could have been distributed. The petitioner had authority to issue only 2,250 shares of preferred stock. The maturity date of all of those shares, save the 300 heretofore mentioned, had already passed and the petitioner had no authority to reissue any of those shares or to issue any other preferred shares. The case must stand or fall on the question of whether or not the petitioner could have distributed a cash dividend without violating the terms of the contract.

The respondent, in making his argument, looks only at the restrictions contained in section 8 (a) of the underwriting agreement. That agreement must be read in its entirety and with due regard for the purpose which it was intended to achieve. The petitioner issued

all of its preferred stock and agreed to pay 1½ percent quarterly on that stock and to retire each share of it on a specified date. The means whereby it was to accomplish these results was set forth in paragraph 5 of the underwriting agreement. That paragraph required the petitioner to enter into a lease with an approved lessee for the entire period during which the preferred stock would be outstanding. The petitioner's only asset was the land and building. It was to lease that asset "at a rental at least sufficient to pay all dividends on said preferred stock and all installments of the principal thereof at the times fixed therefor", taxes, insurance, and all other expenses "to the end that said Realty Company shall at all times have available net revenue ample to meet all of its obligations to its preferred stockholders as the same shall become due." It complied with that provision and used its net revenues to make the quarterly payments and to retire the preferred stock. The retirement of the preferred stock in this way reduced a liability, gave the petitioner a larger equity in its real estate, and enabled it to show a surplus on its balance sheet. But a surplus represented by a larger equity in the real estate did not give the petitioner any funds with which to meet its coming obligations on the preferred stock. It had no other assets with which it could meet its obligations on the preferred stock for the next twelve months. The contract prohibited the petitioner from borrowing money in excess of $5,000 for any purpose except a temporary borrowing to pay current taxes and municipal assessments. The obvious intent of the parties was to require the petitioner to set aside from current earnings an amount sufficient for the purpose of meeting its obligations on the preferred stock for the next twelve months before it could declare a dividend of any kind. The petitioner could not have declared a cash dividend on the common stock in 1936 in any amount from any source without violating the provisions of the underwriting contract, and it is entitled to the credit which it claims. Since the petitioner is entitled to the credit under section 26 (c)(1), it is not necessary to decide whether or not the credit would also be allowable under section 26 (c) (2). However, the interpretation which we have placed upon the contract, together with the other facts in the case, would appear to entitle the petitioner to the credit under section 26 (c) (2) also.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

LEECH and TURNER dissent on the first point.

ARNOLD dissents on the second point.