JOSEPH W. HAMBUECHEN AND ELEANORE HAMBUECHEN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 87769.   Filed October 22, 1964.

*Morton L. Deitch* and *Arthur Wittenstein*, for the petitioners.
*David J. Harris* and *William T. Holloran*, for the respondent.

FAY, *Judge:* The Commissioner determined deficiencies in petitioners' income tax, as follows:

| Year | Deficiency |
| --- | --- |
| 1954 | $9, 824. 42 |
| 1955 | 12, 763. 44 |
| 1956 | 6, 544. 03 |

The only issue for decision is whether petitioners incurred a net operating loss in the year 1951, the unused portion of which could be carried forward as a net operating loss carryover to the years 1954, 1955, and 1956.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioners Joseph W. Hambuechen (hereinafter referred to as petitioner) and Eleanore Hambuechen are husband and wife with their residence in Huntington, N.Y. They filed their joint Federal income tax returns for the taxable years 1954, 1955, and 1956 with the district director of internal revenue, Lower Manhattan District, New York City. For the years in question, petitioners kept their books and filed their returns on a calendar year basis and the cash method of accounting.

Von Heinz, Tecklenburg & Co. (hereinafter sometimes referred to as the partnership) is a partnership which engaged in the business of private banking in Germany. Prior to 1940, the partnership was known by the name of A. E. Wassermann & Co.

Petitioner, a U.S. citizen by reason of birth, spent the early years of his life in Germany. In 1926, he became a general partner in the private banking firm of A. E. Wassermann & Co. with a one-third interest in the partnership. The partnership had been in the commer-

cial banking business in Germany for over 100 years at the time petitioner became a partner. Petitioner took a very active part in the affairs of the partnership. Petitioner helped develop and build up the international credit system for the partnership.

Petitioner remained a general partner until 1931 when his status was changed to that of a limited or special partner. The change of status was brought on by petitioner's fears regarding the German economy. Petitioner, who has a Ph. D. degree in economics, was convinced that Germany was going bankrupt. He was so convinced that he advised his friends who were associated with American banks to withdraw their credit from the partnership, which they did. There were numerous bank failures in Germany in the early 1930's. The partnership suffered substantial losses during this time. In view of the economic status of Germany, the reichsmark, the basic German unit of currency, was blocked (currency could not be withdrawn from the country without Government approval). After petitioner changed his status to that of a limited partner, he began to enter into other business ventures in the field of private banking. He became associated with banking firms in Boston, Mass.; London, England; and Zurich, Switzerland. During the mid-1930's, even though petitioner became associated with numerous other firms, he maintained an active interest in the partnership.

During the 1930's the partnership, like most German banking firms, suffered severe losses because of the operating difficulties and the unsettled condition of the German economy. In view of the many German decrees affecting the banking business and the blocking of the reichsmark, a substantial amount of foreign business was lost. During this time petitioner devoted his energies to reducing the foreign debt of the partnership. In 1935, petitioner, in view of the chaotic state of the German economy, left Germany and moved to Switzerland. He moved his family and set up permanent residence in the United States in 1940.

A substantial amount of the assets of the partnership during the 1930's consisted of receivables due and owing by Jewish merchants in Germany. Seventy-five percent of the domestic business of the partnership was derived from Jewish clients. The receivables due from the Jewish clients were backed up by the business and assets of the borrowers. When the Hitler regime came into power in Germany, more and more Jews were being deprived of their property. This being the situation, the amount of domestic business of the partnership as well as the value of the receivables on hand was rapidly diminishing.

In 1938, the partnership consisted of Sigmund Wassermann and a man named Tecklenburg as general partners and petitioner as a limited partner. During 1938, the Banking Commissioner of Ger-

many requested that the partnership be reorganized to help assure its future solvency. Wassermann was Jewish. He had a one-third interest in the partnership. At this time his capital account had a debit balance. Sometime in 1938 or 1939 Wassermann approached petitioner and indicated his desire to withdraw from the partnership and leave Germany, as it was no longer safe for him to remain. An agreement was reached between Wassermann and petitioner whereby the former would sell his interest in the partnership to petitioner and petitioner would thereby obtain Wassermann's one-third interest in the partnership. As part of their agreement, petitioner agreed to take over the responsibility for the debit balance in Wassermann's capital account. In furtherance of the agreement reached between Wassermann and petitioner and as part of the reorganization of the partnership, another meeting was held in 1939 in Zurich, Switzerland. Attending this meeting were petitioner, his attorney, and von Heinz, Bernstorff, and Wassermann. Petitioner was informed at this meeting that the German bank examiners had found many of the assets of the partnership to be doubtful. Those assets representing loans receivable from Jewish merchants were no longer considered to be worth their face value. In view of the present financial condition of the Jewish clients, as well as the outlook for the future, the bank examiners required that many of the assets of the partnership be written down and some written off. Petitioner was further informed that the sum of 1.6 million reichsmarks would be needed to cover the writedowns and to meet current operating needs. The 1.6 million reichsmarks were required by the German Government to be advanced to the partnership in order for the partnership to continue its operations and to help place it on a solvent basis. Petitioner agreed to advance the necessary funds to the partnership but, at least as to part of the advance, he wanted to establish a creditor's claim. The agreement of the parties was reduced to a written document dated May 8, 1940, the pertinent parts of which are as follows:[1]

Contract (agreement) between:
1. Mr. Albrecht Graf von Bernstorff, Berlin,
2. Mr. Joachim von Heinz, Berlin,
3. Dr. J. W. Hambuechen, Zurich.

### I.

Count Albrecht von Bernstorff and Joachim von Heinz are personally liable partners (general partners) of the limited partnership A. E. Wassermann, Berlin W. 8, (in the following called "Limited Partnership"). Dr. J. W. Hambuechen is a special partner of the limited Partnership.

The agreements between the partners showing their present participation relationship, are set forth in the agreement of August 5/6, 1938, in the text of October 11, 1938. Said agreement was approved by the Foreign Exchange Con-

---

[1] None of the other documents referred to in the agreement have been introduced into evidence. Nor have the annexes to the agreement been introduced into evidence.

trol Office Berlin by decision rendered on December 12, 1938 (File No. Sachgebiet 33 No. 36796/33 I File L.O.W. 12 yellow), after the Commissioner of the Reich for Credits had already approved same by decision of October 12, 1938 (Journal No. 40349/38 III).

Pursuant to an approval issued by the Foreign Exchange Control Office Berlin, bearing date of August 19, 1939 (File No.: Special field 20 Gr. 32818 Record: Dr. Hambuechen, Zurich (green), which was issued pursuant to a decision of the Minister for Economics of the German Reich of August 14, 1939 (Business No. V Dev. 5/33686/39), Dr. Hambuechen made available in connection with the limited partnership an amount of 1.6 million Reichsmark. (special account). The approval of August 19, 1939 provides that in connection with the special account pursuant to individual approvals to be applied for separately, it may be disposed of for certain purposes. Pursuant to an approval of the Foreign Exchange Control Office Berlin of November 23, 1939 (File No.: Special field 20 Gr. No. 38421 H. 1671 (green) there was transferred to the debit of this special account an amount of 604,365 Reichsmark to the assets (property) of the limited partnership. Furthermore Dr. Hambuechen made available the remaining credit balance of his limited liability participation account in the amount of 845,969.68 Reichsmark for write-off purposes. These write-offs were made in the Yearly Balance Sheet of the Limited Partnership of December 31, 1939, so that the limited liability participation account at the present time does not show any credit balance.

The participation of the former personally liable Dr. Sigmund Wassermann who, by virtue of the agreement of August 5/6, 1938, in the text of October 11, 1938, with effect as of June 30, 1938, withdrew from the limited partnership, is carried out, in accordance with Section II, Item (3) of the aforementioned agreement by Count von Bernstorff and von Heinz, as trustees. The details of the trust relationship were reserved for a subsequent agreement, which, however, was not executed up to the present time.

Dr. Wassermann, on his part, assigned and transferred his former participation, in accordance with an instrument in writing confirmed by a Notary bearing date of September 13, 1939, to Dr. Hambuechen. A copy of the assignment declaration is hereto attached as Annex 1).

Inasmuch as in view of the change which occurred in the meantime of the situation, the limited partnership is to be continued for the time being, among the three partners, the following agreement is entered into in order to settle the questions which are pending at the present time among the three partners.

## II.

1) Dr. Hambuechen makes available to the limited partnership, to cover the write-off requirement, which can be noted from the attached statement (Annex 2), out of the special account, an amount of 195,300 Reichsmark. The approval required in this connection of the Foreign Exchange Control Office Berlin has already been given under date of February 28, 1940 (Special subject No. 20/Gr. No. 2116—File H 1671 green).

In the event that on the written-off engagement amounts should be received, they are again credited to the special account of Dr. Hambuechen, with the proviso, which can be noted from Item 2). Proceeds out of the engagement which have been written off to the debit of the credit balance in connection with the limited partnership capital account, will again be credited to same.

2) Dr. Hambuechen agrees to claim the remaining credit balance of the special account amounting to 798,513.85 Reichsmark, only following in rank all the other creditors of the limited partnership. He therefore grants to these creditors a prior ranking, namely, a ranking exceeding his claim in the special account

with the stipulation that the creditors possibly may be authorized to derive independent rights out of this agreement.

The same obligation is undertaken by Dr. Hambuechen with regard to the amounts which may flow back to the special account from the receipts of the written-off engagements.

3) Dr. Hambuechen agrees to leave the special account with the limited company as long as he participates in same as a special partner. The original limited partnership account and the capital account of the participation assumed by Dr. Wassermann had to be made up again either by payment or by leaving later profits with the partnership.

4) Count Bernstorff and Mr. von Heinz confirm the transfer made with effect of July 1, 1938 in accordance with Annex 1, of the former participation of Dr. Wassermann to Dr. Hambuechen, which consists of a participation of 33⅓% in the profits and losses, and in the limited partnership assets, insofar as the latter exceed the capital accounts of the individual partners. This participation therefore while changing into a limited partnership participation, is added to the previous limited partnership participation of Dr. Hambuechen. The amount of the liability of Dr. Hambuechen is not changed thereby.

*      *      *      *      *      *      *

9) Insofar as by the foregoing agreements creditors of the limited partnership are being favored, the agreement can only be changed with the consent of the Reich Supervisory Office for Credit Matters, to the disadvantage of the creditors.

10) The agreement entered into in the foregoing enters into force and effect with respect to Item 4), as of July 1, 1938; otherwise it becomes effective as of January 1, 1940, as soon as the required approvals of the Control Office of the German Reich for credits, and of the Foreign Exchange Control Office have been given.

Berlin, Zurich, May 8, 1940.

> Signed: Dr. Josef W. Hambuechen
> Signed: A. Bernstorff
> Signed: J. von Heinz

As part of the agreement and in conjunction with the withdrawing of Wassermann as a general partner, Bernstorff and von Heinz became general partners of the partnership together with Tecklenburg. Petitioner continued as a special partner with his interest in the partnership, after the agreement, being 57.57 percent.[2] The name of the partnership was changed to von Heinz, Tecklenburg & Co. The reason for the change of name was to remove the name "Wassermann" as it was against the Hitler regime to have the name of a Jew as part of the firm name. At the time the aforementioned agreement was entered into, petitioner had a credit balance of 845,969 reichsmarks in his capital account.

Pursuant to the agreement petitioner advanced the following

---

[2] The record is not clear on this point. Petitioner had a 33⅓-percent interest in the partnership prior to the reorganization. As part of the reorganization of the partnership, petitioner acquired Wassermann's one-third interest, giving petitioner a total interest of 66⅔ percent. After the written agreement, petitioner's interest is stated as 57.57 percent. The explanation for the difference is that petitioner gave the new general partners (von Heinz and Bernstorff) a part of his interest.

amounts to the partnership: Approximately 600,000 reichsmarks were paid to the firm through the Reich Bank; securities owned by petitioner and worth approximately 589,000 reichsmarks were made available to the partnership; approximately 400,000 reichsmarks were credited to his account representing a transfer from his capital account in another one of his business ventures.[3] At the time of the advance of funds, the reichsmark had a value, in terms of U.S. currency, of $0.40061. The entire sum advanced by petitioner was credited to a special account, created for this purpose. In furtherance of the agreement, the special account was debited for 604,365 reichsmarks and 195,300 reichsmarks to cover the writeoff of assets. Petitioner's capital account, which was a separate account from the special account, was also debited to the extent of 845,969 reichsmarks to aid in the writing off of assets. The result of this latter entry left petitioner's capital account with a zero balance. After the aforementioned debits to the special account, the balance was 789,335 reichsmarks.[4] If additional writeoffs were necessary, the special account would be debited. If any of the accounts written off were subsequently made good, the special account would be credited. The balance in the special account was to be left in the partnership as long as petitioner was associated with the partnership as a special partner. This was true even though some of the assets originally written off and charged against the special account were subsequently paid and credited to the account. As per the agreement, the balance in the special account was subordinated to the claims of all the creditors of the partnership. The agreement did not provide for the payment of interest to petitioner on the balance in the special account. The agreement did not provide that the balance in the special account would be secured by a mortgage on the partnership assets or by any other security.

At the same time petitioner advanced funds to the partnership he also loaned money to the two new general partners to enable them to buy into the partnership. These loans bore interest at the rate of 4 percent per annum.

On December 11, 1941, the United States declared war on Germany. At this time, the partnership had assets located in other countries besides Germany. These assets consisted of amounts due and owing from various banking concerns located in numerous countries.[5] After the cessation of hostilities with Germany in 1945, the partnership

---

[3] The record indicates that the sums advanced were approximately 11,000 reichsmarks short of the 1.6 million called for in the agreement. This difference is not accounted for in the record.

[4] The agreement indicates the balance was 798,513 reichsmarks. The difference between the balance we find and the balance shown in the agreement stems from the fact that we have found approximately 1.589 million reichsmarks were advanced and not 1.6 million. See fn. 3, *supra.*

[5] Although the record indicates there were partnership assets located in various countries as of September 1939, the record is silent as to the value of these assets.

continued to do business for the purpose of liquidation and throughout the liquidation was subject to German Government legislation and control. The office of the partnership was located in the Russian sector of Berlin. However, there were partnership assets in West Berlin. Upon the conclusion of the war, all of the assets of the partnership located in the Russian sector of Berlin were seized by the Communists and the banking activities of the partnership ceased, except for the purposes of liquidation, which is still in progress. The books and records of the partnership were located in the office of the company in East Berlin and were seized by the Russians in 1945. Property situated in the Western sector of Berlin was not seized and the liquidation thereof ensued and is still in progress. Petitioner is presently still a limited partner in the partnership and has been one ever since 1931.

On June 20, 1948, the German Government passed the Currency Reform Act which revalued the currency. The basic unit which was formerly known as the reichsmark was now to be known as the deutsche mark. The conversion rate was set at 10 reichsmarks for 1 deutsche mark. On October 1, 1948, an addendum was made to the Currency Reform Act which had the effect of freeing a large portion of the claims held by private banks against the Government. In view of this act, certain funds came into the hands of the partnership. These funds were used to pay off creditors of the partnership.

Sometime after the end of hostilities, the agreement of May 8, 1940, between petitioner and the partnership was amended to enable petitioner to withdraw the balance in the special account after the claims of all creditors had been satisfied.

In 1951 petitioner's special account had a credit balance of 746,912 reichsmarks.[6] The partnership having paid off all outside creditors and having funds available and being in the process of liquidation, agreed to pay petitioner the balance in his special account. In 1951, petitioner received the sum of 36,972.15 deutsche marks, the legal equivalent of 746,912 reichsmarks. The then current value of 1 deutsche mark expressed in terms of U.S. currency was $0.2381.

On petitioner's 1951 income tax return he claimed a business loss computed as follows:

| | |
|---|---:|
| Basis of 746,912 reichsmarks valued at average noon buying rates in New York for the year 1939 | $299, 220. 42 |
| Proceeds of disposal in 1951 as claimed on 1951 return | 8, 792. 39 |
| Loss claimed on 1951 return | 290, 428. 03 |

Petitioner carried part of the loss forward to the years in issue as a net operating loss carryforward. Respondent has disallowed the net operating loss carryforward in all of the years in issue.

---

[6] The difference between this figure and the 789,335 reichsmarks as of the date of the agreement stems from additional debits to reflect more writeoffs.

### ULTIMATE FACT

The advance of approximately 1.6 million reichsmarks by petitioner to the partnership in 1939 did not create a valid debt but was instead a capital contribution.

### OPINION

The asserted deficiencies for the years 1954, 1955, and 1956 are due solely to respondent's disallowance of a claimed net operating loss carryover from the year 1951. The validity of the deficiencies asserted by respondent depends upon a determination of the following question: Did petitioner sustain a loss under section 23(e) (1) or (2), I.R.C. 1939,[7] during the year 1951, which loss, by virtue of section 122, could be carried forward to the years 1954, 1955, and 1956?

Petitioner maintains that pursuant to an agreement reached with the partnership he loaned it 1.6 million reichsmarks in 1939 at a time when the reichsmark was worth 40 cents in U.S. currency. He further maintains that the 1.6 million reichsmarks advanced were placed in a special account and that the balance of the account, after certain debits to it, was to represent a subordinated loan. Petitioner claims that the balance in the special account in 1951 was 746,912 reichsmarks. This amount, petitioner contends, when converted into deutsche marks, the then legal currency of Germany brought about by the revolution of the reichsmark in 1948, was 36,972 deutsche marks. The deutsche mark at this time was worth $0.2381 in U.S. currency. Petitioner claims that the difference between the dollar value of 746,912 reichsmarks as of 1939 and the dollar value of 36,972 deutsche marks in 1951 constitutes a loss from his trade or business deductible in 1951 under section 23(e) (1).[8] The amount of the loss, as computed by petitioner, was $290,428.03.

Respondent, on the other hand, takes the position that there was no section 23(e) loss for two reasons, either one of which is fatal to petitioner's case. First, respondent argues that the advance of 1.6 million reichsmarks to the partnership in 1939 was a contribution to capital and did not create a debtor-creditor relationship. If this is true, respondent maintains that petitioner cannot claim any loss until his interest in the partnership is liquidated. Second, for a loss to be deductible under section 23(e) by an individual, it must be incurred in a trade or business or in a transaction entered into for profit though

---

[7] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1939.

[8] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; \* \* \*

not connected with a trade or business. Respondent maintains that petitioner was not in a trade or business of lending money, so that if the Court were to find that a valid loan was made the loss sustained thereby does not fall under section 23 (e). Respondent then maintains that at best petitioner's claim against the partnership was in the nature of a bad debt. Since petitioner is not in the trade or business of lending money, respondent argues that the nonbusiness bad debt provisions apply.[9] Respondent concludes his argument with the contention that in any event the loss was a war loss and should have been claimed in 1941 under the provisions of section 127. A finding for the respondent on any one of these arguments would be fatal to petitioner's case.

We turn our attention first to the question whether or not the advance of approximately 1.6 million reichsmarks by petitioner to his partnership constituted for tax purposes, in any part, a loan. If the question is answered in the negative, respondent's determination in the case must be sustained.

We state at the outset that a partner can loan money to a partnership in which he is a partner. *George A. Butler*, 36 T.C. 1097, 1106 (1961); *J. C. Wynne*, 47 B.T.A. 731, 735 (1942); *Samuel Burns*, 13 B.T.A. 579, 582 (1928). Whether or not a particular transaction, for tax purposes, creates a valid debtor-creditor relationship, or is in reality a contribution to capital is essentially a question of fact to be determined from all the surrounding facts and circumstances, *Matthiessen* v. *Commissioner*, 194 F. 2d 659, 661 (C.A. 2, 1952), affirming 16 T.C. 781 (1951), with the taxpayer having the burden to establish the debtor-creditor relationship, *Gilbert* v. *Commissioner*, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959); *Ludwig Baumann & Co.* v. *Commissioner*, 312 F. 2d 557 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court. It has been stated many times that the form the transaction takes is not controlling, but rather the "substance," *American-LaFrance-Foamite Corporation* v. *Commissioner*, 284 F. 2d 723 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 881 (1961); *Gregory* v. *Helvering*, 293 U.S. 465 (1935). Accordingly, the taxpayer's motive, though a factor to

---

[9] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(k) BAD DEBTS.—
(4) NON-BUSINESS DEBTS.—In the case of a taxpayer other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

be considered, is not the crucial factor, *Gilbert* v. *Commissioner*, 248 F. 2d 399, 404 (C.A. 2, 1957).

The question of whether a particular transaction creates a debtor-creditor relationship or is in reality a contribution to capital is not a new one. It has arisen taxwise in issues involving the proper treatment of unrecovered advances either as a bad debt or as a capital loss. *Edward G. Janeway*, 2 T.C. 197 (1943), affd. 147 F. 2d 602 (C.A. 2, 1945). It has also arisen in issues involving a determination as to whether a payment of a corporation designated as interest is deductible as such, *2554-58 Creston Corp.*, 40 T.C. 932 (1963). Another situation where the issue arises concerns the tax treatment and characterization of amounts received on the retirement of the "indebtedness," *Moughon* v. *Commissioner*, 329 F. 2d 399 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court. The present case, although not concerned with either a question of an interest deduction or a question of a bad debt deduction, see *Richard Bohm*, 34 T.C. 929, 930 (1960), is concerned with a question regarding the tax treatment and characterization of an amount of money received by the petitioner in 1951. If the money advanced in 1939 to the partnership was a capital contribution, the amount received in 1951 could not give rise to a loss deduction under section 23(e). At best, it would be a partial return of petitioner's investment, which may or may not give rise to a loss at some future date when his entire investment in the partnership is liquidated.

Numerous factors and criteria have been mentioned by this Court as well as other courts which are pertinent to the question whether a debtor-creditor relationship has been established for tax purposes. Such factors as adequacy of the capitalization of the debtor, issuance of any notes, provision for and payment of interest, presence or absence of a maturity date, intention to repay, whether the alleged debt is subordinated to claims of outside creditors, whether outside creditors would have made similar advances under the circumstances, presence or absence of security for the alleged loan, reasonableness of expectation of payment, use to which the funds were put, and whether payment can only be paid out of future profits, are a few of those most frequently mentioned. See *Arlington Park Jockey Club* v. *Sauber*, 262 F. 2d 902, 905 (C.A. 7, 1959); *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39, 47 (C.A. 2, 1962), remanding for other reasons 35 T.C. 268 (1960). It has been aptly stated that "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event." *Commissioner* v. *Meridian & Thirteenth R. Co.*, 132 F. 2d 182, 186 (C.A. 7, 1942), reversing 44 B.T.A. 865 (1941). Although no one factor by itself is determinative of the question, a significant factor is "whether the funds were

advanced with reasonable expectations of repayment regardless of the success of the venture, or were placed at the risk of the business." *Gilbert* v. *Commissioner*, 248 F. 2d at 406.

The principles enumerated above are not disputed by petitioner. However, he argues that we have in the instant case an advance by a partner to his partnership and not an advance by a stockholder to his corporation. Petitioner contends that the so-called thin capitalization cases dealing with corporations are not applicable to a partnership.

We recognize that we are concerned here with the question whether an advance of funds by a partner to his partnership creates a valid debtor-creditor relationship. And, it is true, as petitioner states, that the entire area of case law within which we are concerned has developed over transactions involving stockholders and their corporations. Although we have not been able to find, nor have we been referred to, a case wherein a court has applied the aforementioned principles to a situation involving an advance by a partner to his partnership, we have likewise not been able to find, nor have we been referred to, a case wherein a court has refused to apply these principles to a partner-partnership transaction. Accordingly, we treat this case as one of first impression.

Petitioner recognizes that if we determine that his advance was a capital contribution the partial repayment of the advance in 1951 would not constitute a section 23 (e) loss, which in turn would eliminate any net operating loss for the year. Yet, he argues that we should not determine the question regarding the tax character of the advance by the same criteria used to determine a similar question involving a stockholder-corporation. The only explanation we are given for his position is that the thin-capitalization concept has no application to advances to a partnership. This is further explained by the following in petitioner's brief:

When money is advanced to a corporation by its stockholders in roughly the same proportions as their stockholdings, the economic effect is the same whether the money is advanced in the form of a subordinated loan or as equity capital, and tax considerations will often govern the form the transaction takes. On the other hand, when a limited partner advances money to a partnership, there is a substantial economic difference between a subordinated loan and a capital contribution—general partners are personally liable for repayment of the loan, whereas only partnership assets stand behind a partner's partnership account.

What petitioner says regarding the economic effect of advances to corporations by stockholders as compared to advances to partnerships by partners may be true. However, we cannot accept as true his understanding of the application of the thin-capitalization concept in determining the instant issue. Petitioner is of the opinion that all of the factors we have set forth also constitute and are equated to the concept of thin capitalization. This is obviously not so. One of the

factors looked to by the courts is the capitalization of the debtor (corporation) and frequently a debt-to-equity ratio is obtained. The higher the debt-to-equity ratio the more likelihood that the advance is equity. However, this is only one factor used by the courts. It is not the most significant nor is it the controlling factor. We doubt that petitioner takes the position that such factors as the presence of a note, interest, security, and maturity date, to mention a few, should not be considered by this Court in determining the question at issue.

Moreover, we are concerned here with the economic reality of what took place. In either case, corporation or partnership, the question remains—did the advance create a valid debt to be recognized for tax purposes, no matter what the particular tax consequences may be? Thus, whether a corporation is trying to take an interest deduction or whether a stockholder is trying to escape being taxed on the receipt of a constructive dividend or, as in this case, whether a partner can take an ordinary loss deduction, the question remains, did a valid debt exist? In all cases, the particular tax consequences desired depends upon the establishment of a valid debtor-creditor relationship. We recognize that corporations and partnerships are treated, for tax purposes, differently. Dealings by a stockholder with his corporation may produce certain tax results while dealings by a partner with his partnership will bring different tax results. We find no useful purpose in listing or enumerating the tax differences between the two. Petitioner does not enlighten us with what test or what factors we should look at in determining the question at issue. He says only that we should not use the factors which are used by courts in determining the issue when a stockholder-corporation is involved, yet the issue is, as we have seen, the same. We can see no valid reason why, once it is necessary, for tax purposes, to determine the existence of a debtor-creditor relationship, such determination should be made upon different factors or criteria depending upon who the debtor and creditor are and their relationship to each other. We recognize that if a debtor-creditor falls within a certain relationship (stockholder-corporation), this might require more careful scrutiny of the transaction, but the ultimate determination of the existence or nonexistence of a debt should be made upon the same factors with the possible shifting of the weight given to any one factor. Congress saw fit to treat a loss arising from operating a trade or business differently than a loss arising from an investment in a trade or business. Therefore, it sometimes becomes necessary to determine the tax character of a loss. In this case, before such a determination can be made, it is first necessary to determine whether in fact a loss has occurred, the answer to this question depending upon whether a transaction which took place in 1939 created a valid debt or was merely a contribution to capital. We have been unable to find any valid reason why a determination of this question should not be based

upon a consideration of those factors utilized by courts in determining the same question wherein stockholders and corporations are involved. Accordingly, we hold that where it becomes necessary, for tax purposes, to determine whether an advance by a partner to his partnership was in fact a loan, a determination of this question will be based upon all the facts and circumstances surrounding the transaction, including those factors previously enumerated.

We will now set forth below some of the factors, including a review of the facts, that lead us to the ultimate conclusion that the advance by petitioner in 1939 did not create a valid debt for tax purposes.

Petitioner entered the partnership as a general partner in 1926, obtaining a one-third interest in the company. The record does not tell us how much petitioner paid for his interest. In 1931, petitioner changed his status from a general partner to a limited or special partner, maintaining his one-third interest. The explanation for this change was that petitioner was of the opinion that the German economy was going bankrupt. Petitioner was so convinced that he induced his friends who were associated with American banks to withdraw their credit from his own partnership. Then came the bank failures in Germany. The German Government blocked the reichsmark, which had the effect of diminishing the foreign business of the partnership. During this time, petitioner began expanding his banking interests. He became associated with firms located in the United States, England, and Switzerland. In 1935, the economic conditions in Germany were at such a low point that petitioner decided to leave Germany and set up house in Switzerland. During the 1930's, petitioner maintained an active interest in the partnership, doing his best to reduce the debts of the company. Sometime in 1938 or 1939, the record not being too clear, Wassermann, a general partner of the partnership, approached petitioner with the aim of getting petitioner to buy his interest in the partnership. At this time, the Hitler regime was in power in Germany. Jewish merchants were losing their property and their businesses. A large portion of the assets of the partnership consisted of receivables due from Jewish merchants. With these existing conditions, the domestic business of the partnership was greatly diminished. Wassermann had a one-third interest in the partnership. Some form of agreement was reached whereby petitioner was to make good the then debit balance in Wassermann's capital account, and in return would receive Wassermann's interest in the firm. The agreement itself was not introduced into evidence. Petitioner, as a result of the agreement, had increased his interest in the partnership to two-thirds. In 1939, after the German banking authorities informed the partnership that a reorganization was necessary in order to improve the financial picture of the partnership, a meeting was held in Switzerland. At this meeting, petitioner was informed

that 1.6 million reichsmarks would be needed by the partnership for operating assets and to be used to cover writedown and writeoff of assets. An agreement was reached at this meeting whereby petitioner made available the necessary reichsmarks. At this time, petitioner's capital account showed a credit balance of 845,969 reichsmarks. As part of the agreement, the entire balance in the capital account was used to write off assets. More than one-half of the 1.589 million reichsmarks advanced by petitioner were also used to cover writeoff of assets. Although the actual financial condition of the partnership was not offered in evidence, it is obvious that the partnership was in difficulty. Petitioner, having a 66⅔-percent interest in the partnership, did not have a single reichsmark to his credit in his capital account. On these facts, we are convinced that an outside creditor would not have made a loan of approximately 1.6 million reichsmarks secured only by the future success of the partnership. As we noted previously, this factor, though not controlling, is highly significant. *Gilbert* v. *Commissioner*, 248 F. 2d at 406; *Nassau Lens Co.* v. *Commissioner, supra; 2554–58 Creston Corp., supra.*

The money was advanced without security in any form. No interest was charged and none paid. Yet when petitioner loaned one of the general partners money, interest at the rate of 4 percent was charged. Petitioner was an intelligent man. He knew the economic status of Germany. He knew the financial condition of his own partnership. The special account, to which his advance was credited, could be utilized for more writeoffs in the future if this became necessary. No provision was made to replenish the account. The only hope of repayment was that the business would prosper in the future. Petitioner, under the terms of the original agreement, could not withdraw the balance in the special account until he terminated his relationship with the partnership. The agreement was later amended so that petitioner could withdraw the balance after the claims of all creditors had been paid in full. At all times his purported creditor's claim was subordinated to the claims of creditors, past, present, and future. It is difficult for us to conceive how an advance of this size made to a business which was in such financial difficulty and which did not have prospects for a bright future, made by a partner with at least a 60-percent interest in the partnership, could be considered loans. *American-LaFrance-Foamite Corporation* v. *Commissioner, supra; Gilbert* v. *Commissioner*, 248 F. 2d at 406.

Petitioner argues that he did have expectations of repayment. He points to the fact that the partnership had assets both in Germany and elsewhere and that the repayment of his "loan" was never in doubt. We cannot agree with these contentions of petitioner based upon the record before us. The record indicates that the partnership had assets in various countries at and around the time of the advance.

However, we are not told of the value, even if only an approximation, nor are we told of the existence of outside creditors. Moreover, we will not assume facts in petitioner's favor that are unsupported in the record by competent evidence. *2554–58 Creston Corp., supra* at 938. However, we are told that a large percentage of their receivables were worth substantially less than face value and that 1.6 million reichsmarks were deemed necessary by the German banking authorities to keep the partnership above water. These facts indicate that financially the partnership was not faring too well and was in desperate need of risk capital. In view of the chaotic status of the German economy and in view of conditions in general throughout Europe, including the existence of war, we are unable to believe that petitioner, having a doctor's degree in economics, expected repayment of his "loan" in any event, but that he anticipated payment only if the partnership should once again prosper. This does not indicate a loan. *Gilbert* v. *Commissioner, supra,* 262 F. 2d at 514.

Petitioner also points to the fact that when he advanced the money to the partnership he was not thinking about his U.S. Federal income tax. He claims that the transaction was not in any way motivated by tax considerations. Although we agree with petitioner that most likely in 1939, when he advanced money to his partnership, he was not concerned with a possible tax deduction in 1951 and that he was more directly concerned with saving a partnership from financial ruin, nevertheless, we must look to the substance of the transaction and not just the form. *Commissioner* v. *Court Holding Co.,* 324 U.S. 331, 334 (1945). We have already stated that taxpayer's motive is not the crucial factor. *Gilbert* v. *Commissioner,* 262 F. 2d at 514. The characterization urged by petitioner does not accord with substantial economic reality. *Gilbert* v. *Commissioner,* 248 F. 2d at 406. Accordingly, the absence of any tax motive consideration on the part of the taxpayer is not determinative of the issue. Cf. *Lynch* v. *Commissioner,* 273 F. 2d 867, 872 (C.A. 2, 1959), affirming 31 T.C. 990 (1957).

We are also mindful of petitioner's testimony that he made the advance with the understanding that he would be able to establish a creditor's claim. However, it has been stated numerous times before that "petitioners' self-serving statements that the advances were intended to be loans bear little weight in the face of the other facts of record." *Erard A. Matthiessen,* 16 T.C. 781, 786 (1951), affd. 194 F. 2d 659 (C.A. 2, 1952); *Sam Schnitzer,* 13 T.C. 43, 60 (1949), affirmed per curiam 183 F. 2d 70 (C.A. 9, 1950), certiorari denied 340 U.S. 911 (1951); *Isidor Dobkin,* 15 T.C. 31, 33 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951); *R. E. Nelson,* 19 T.C. 575, 579 (1952).

The subordinating of petitioner's claim to that of all other creditors of the partnership is a strong indication that the advance was really a capital contribution especially when combined with the factor that repayment was to be made only when petitioner terminated his interest in the partnership. *Watson* v. *Commissioner*, 124 F. 2d 437 (C.A. 2, 1942), affirming 42 B.T.A. 52 (1940).

We feel that the advance made by petitioner was intended to be subject to the risk of the business and not repayable in any event. We think that the entire record, though not completely free from doubt, establishes that the advance was a capital contribution and did not create a valid debtor-creditor relationship. *American-LaFrance-Foamite Corporation* v. *Commissioner, supra.*

In view of our holding on this issue, we need not consider, if there was a loan created, whether the loss therefrom stems from a trade or business, see *George A. Butler, supra* at 1106, or whether the loss should be governed by the bad debt provisions, see *Richard Bohm, supra.*

*Decision will be entered for the respondent.*