FEDERAL PROJECTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Federal Projects, Inc. v. Commissioner
Docket No. 6223-82.
United States Tax Court
T.C. Memo 1987-202; 1987 Tax Ct. Memo LEXIS 196; 53 T.C.M. (CCH) 623; T.C.M. (RIA) 87202; April 15, 1987. Michael Casterton, for the petitioner. Lynn Casimir, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and an addition to tax as follows: Tax Year Ended
Addition to Tax
October 31
Deficiency
Section 6653(a) [1]
1975
$532,657
$25,921
1976
226,616
After concessions, the issues for decision are: (1) whether respondent *197 abused his discretion in disallowing petitioner's claimed deductions for additions to its reserve for bad debts for fiscal years ended October 31, 1975 and 1976 in the amounts of $285,000 and $240,000, respectively; and (2) whether petitioner was negligent or intentionally disregarded the rules and regulations, within the meaning of section 6653(a), when it failed to report income which should have been included in its return for its fiscal year ended October 31, 1975. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioner, Federal Projects, Inc. (FPI), a California corporation organized in 1968, had its principal place of business in Sacramento, California at the time the petition herein was filed. FPI is engaged in the business of developing and managing multifamily, low-and moderate-income housing projects; the Federal Housing Administration (FHA) insures *198 mortgages on these projects by approved private lenders. FPI is the parent corporation of five subsidiaries. The subsidiaries are: (1) Federal Projects Construction, Inc.
(FPCI)
(2) Camellia Construction Company
(CCC)
(3) Federal Projects Development, Inc.
(FPDI)
(4) Century City Mortgage Company
(CCMC)
(5) Federal Projects Management, Inc.
(FPMI)
The function of each corporation (with respect to developing and managing the FHA-insured housing projects) is: FPI - performs architectural and organization services for the projects; FPCI - serves as a general contractor for each project; CCC - performs services for FPCI; FPDI - performs services with respect to selling interests in limited partnerships which will own each project; CCMC - acts as mortgagee, and provides the FHA-insured financing, for the projects; and FPMI - provides ongoing property management for the projects on behalf of the limited partnerships. FPI and its subsidiaries (collectively referred to as "the Federal group") filed consolidated tax returns for the taxable years in issue, using the accrual method of accounting. At all relevant times, the stock of FPI was *199 owned 25 percent each by Don Holland, George Holland, [2] Dallas Christian and Hal Treadaway. Don Holland was the individual who primarily dealt with the FHA. FHA-insured financing was obtained for all of the housing projects developed by FPI. FHA-insured financing differs from conventional financing in two material respects, viz: (1) the amount which can be borrowed through FHA-insured financing is greater than the amount which can be borrowed through conventional financing, and (2) the interest rate on FHA-insured mortgages is lower than conventional interest rates. FHA-insured projects are heavily regulated. The amount of rent obtainable in an FHA-insured project is below the market rate, and all increases in rent require prior approval by the FHA. Further, FHA regulations prohibit distributions of income from a project in excess of a specified percentage of the equity in the project. In general, once an FHA conditional commitment for a project was obtained (but prior to the date of final approval by the FHA), a limited partnership to construct and own the project was formed. [3] The partnership would then enter into fee arrangements *200 with the Federal group whereby the latter would agree to (a) provide architectural services in designing the project, (b) construct the project, (c) obtain necessary financing, and (d) manage the project after construction. Once final approval by the FHA was obtained, limited partnership interests in the partnership were sold to outside investors. In addition to its other fees, the Federal group received a builder's and sponsor's profit and risk allowance fee equal to up to ten percent of the cost to construct the project (exclusive of land or leasehold costs). The investors understood that there would be little, if any, current cash flow from the project and that they could recover their investment only upon the sale of the project by the partnership. They anticipated that the project would be sold six to ten years after construction. In 1971, the owners of FPI formed a general partnership, called Federal Projects Investment Company (FPIC), which coordinated the interactions between the FHA, FPI, and the investors in the limited partnerships. FPIC was owned in equal shares by Don Holland, George Holland, Dallas *201 Christian and Hal Treadaway, i.e., the same individuals who owned the stock of FPI. The Federal group constructed the following seventeen projects between 1969 and 1975: Year
Construction
Project
Started
Completed
Auburn Gardens
1971
1972
Campus Gardens
1969
1970
Cordona Gardens
1970
1971
Crosswood
1969
1970
Fairfield
1973
1975
Folsom I
1969
1970
Hillsdale Gardens
1971
1972
Live Oak
1973
1974
Pine II
1972
1973
Rosemont Terrace
1969
1970
Siskiyou Gardens
1973
1974
Stockton Gardens
1970
1971
Susanville
1972
1974
Tracy Gardens
1971
1972
Woodland Gardens
1969
1970
Eastern Co-Op
1970
1971
Redding Co-Op
1972
1973
The first fifteen named projects were owned by limited partnerships; the other two projects were cooperatives. In six of the limited partnerships, Don Holland was the general partner; in two limited partnerships, FPI was the general partner; and in four limited partnerships, Don Holland and FPI were co-general partners. The general partner in the remaining three limited partnerships was FPIC. Whenever Don Holland acted as general partner, it was agreed that he was also acting on behalf *202 of the other shareholders of FPI. [4]
The various entities, and data deemed pertinent, are illustrated in the following chart: [SEE ILLUSTRATION IN ORIGINAL] It was agreed that the investors would receive a cumulative return on their investments of 6 percent per annum (or the maximum amount of cash available for distribution, under FHA regulations) and that they would not be required to make additional future capital contributions to the projects. Further, it was understood that FPI would be the primary source of financial support in the projects; in essence, FPI was the "bill payer" for all obligations of the partnership which could not be paid out of partnership cash flow. In order to obtain FHA approval, FPI was required to certify that it had never defaulted on an FHA-insured project. Had there been any default, the FHA would have ceased to deal with the *203 Federal group and its principals, and it is probable that no investors would have been available for future projects undertaken by the Federal group. Due to the restrictions on rent increases, and the insufficiency of rental income to meet expenses incurred in operating the projects, regular infusions of funds were necessary to keep the projects afloat. From time to time, therefore, FPI and FPMI made the following advances on behalf of the limited partnerships and co-ops, even though FPI was a general partner in only six of the limited partnerships: Outstanding
Outstanding
Advances
Advances
as of
as of
Project
10/31/75
10/31/76
Auburn Gardens
none
$2,462
Campus Gardens
$24,424 25,814
Cordova Gardens
82,823
43,379
Crosswood
29,725
23,343
Fairfield
none
13,323
Folsom I
7,715
8,958
Hillsdale Gardens
27,598
35,584
Live Oak
none
67,703
Pine II
none
3,752
Rosemont Terrace
76,343
49,512
Siskiyou Gardens
none
7,641
Stockton Gardens
65,249
58,943
Susanville
none
13,053
Tracy Gardens
36,827
37,425
Woodland Gardens
52,660
47,952
Eastern Co-Op
(4,672)
(3,782)
Redding Co-Op
54,003
none
*204 Neither Don Holland nor FPIC made any such advances, even to projects in which they were general partners. The advances typically did not involve actual transfers of funds, because the advances were for construction cost overruns, development costs, management fees and payroll owed by the limited partnerships to FPI or FPMI. Rather, FPI and FPMI merely adjusted their books to account for the advances. No notes were executed to evidence any indebtedness of the limited partnerships or the cooperatives, and no date was specified for the repayment of any advances. It was understood, however, that any repayment would be made without interest, and that the advances would be subordinated to all other debts of the partnerships, including the right of each limited partner to receive the return of his initial contribution to the partnership plus a specified cumulative return on his investment. FPI's certified public accountant, William Deason, became concerned about the growing size and collectibility of the advances. For financial accounting purposes, Mr. Deason insisted that FPI's and FPMI's reserve for bad debts (which had been established in the fiscal year ended October 31, 1973) *205 [5] be increased to reflect the possible non-repayment of the advances. After discussions at the end of FPI's 1975 and 1976 fiscal years, among William Deason, Don Holland, Hal Treadaway and the controller of FPI, it was decided that FPI would increase its reserve for bad debts to reflect uncollectible advances which had been made in prior years. In addition, the reserve was increased for advances made during the then current fiscal year. In total, FPI increased its reserve for bad debts, and took a deduction under section 166 with respect thereto, in the amount of $285,963 for its 1975 fiscal year and $240,000 for its 1976 fiscal year. [6]
*206 In 1978, six of the projects (Cordova Gardens, Live Oaks, Rosemont Terrace, Stockton Gardens, Tracy Gardens, and Woodland Gardens) were sold, and FPI was repaid most, if not all, of its advances to the partnerships owning such projects. Respondent disallowed all but $963 of FPI's claimed deduction in 1975 and the entire claimed deduction in 1976 for additions to its bad debt reserve, contending that the amounts advanced by FPI to the limited partnerships were not bona fide loans. Respondent further contends that even if the advances constituted bona fide loans, FPI could reasonably have expected an eventual repayment of the advances; accordingly, respondent argues, he did not abuse his discretion in disallowing the amounts added to FPI's bad debt reserve for the years involved. FPI contends that its advances were bona fide and could not, in 1975 or 1976, reasonably be expected to be repaid by the projects to which the advances had been made, due to the insufficient cash flow generated by the housing projects. Recovery of the advances upon the sale of the projects was also not deemed possible, claims petitioner, because the then economic recession had so depressed the values *207 of the projects that any sales proceeds would be insufficient to repay the mortgage and the amounts due the investors before the advances to FPI could be repaid. The advances were therefore uncollectible, argues petitioner, and the additions to FPI's reserve for bad debts with respect thereto were proper. Prior to trial, petitioner conceded, among other issues, that it erroneously failed to include $754,050 in income for 1975. The $754,050 represented the proceeds of a draw which were erroneously deposited in FPIC's bank account and credited to one of the limited partnerships. When the error was discovered in 1976, an adjusting entry was made, and the $754,050 was reported by FPI as 1976 income. In his notice of deficiency, respondent determined an addition to FPI's 1975 income tax for negligence with respect to the shifting of the $754,050 income from 1975 to 1976. Petitioner contends that the addition to tax for negligence is not appropriate. OPINION Section 166(a) allows a deduction in respect of bad debts owed to the taxpayer. Bad debts may be taken into account either as specific items, or, in respondent's discretion, may be deducted as additions to a reserve for bad *208 debts. Regardless of the method used by a taxpayer, only a bona fide debt which becomes worthless during the taxable year can give rise to a deduction under section 166. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.166-1(c), Income Tax Regs. A debt arising out of a receivable of an accrual method taxpayer is an enforceable obligation to the extent that the income such debt represents has been included into income. A contribution of capital is not considered a debt for purposes of section 166. Determining for tax purposes whether advances are to be treated as bona fide debts is often necessary when a taxpayer advances funds to his closely-owned corporation. In such a situation, the purported "loan" may be recharacterized as an equity contribution to the corporation. Section 385, and various standards devised by the courts, provide the analytical framework for determining whether debt or equity is created. The same analysis which applies to advances by a shareholder to his corporation applies to advances by a partner to his partnership. *209 Hambuechen v. Commissioner,43 T.C. 90 (1964). Section 385(b) sets forth the following relevant factors which may be taken into account in determining whether a debtor-creditor relationship exists: (1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest; (2) whether there is subordination to or preference over any indebtedness of the corporation; (3) the ratio of debt to equity of the corporation; (4) whether there is convertibility into stock of the corporation; and (5) the relationship between holdings of stock in the corporation and holdings of the interest in question. The Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie, has held that we must be guided by the above-listed five factors set forth in section 385(b) and by the case law and has set forth the following eleven factors that should be considered: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the *210 right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or inadequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. Bauer v. Commissioner,748 F.2d 1365, 1368 (9th Cir. 1984), citing A.R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970). The form of the transaction is not controlling and no one factor is determinative; rather, characterization depends upon the taxpayer's true intent as evidenced by the particular circumstances and conditions of the advance. Bauer v. Commissioner,supra at 1368. The taxpayer has the burden of establishing that the advances were loans, rather than capital contributions. O. H. Kruse Grain & Milling v. Commissioner,279 F.2d 123 (9th Cir. 1960). In this case, after evaluating all the circumstances and conditions of the advances, we find that petitioner *211 failed to carry this burden. None of the advances to the limited partnerships was evidenced in writing or secured by collateral; no interest rate or maturity date existed. All of the advances were subordinated to other partnership debts including the right of the investor/limited partners to receive their investment plus a specified rate of return thereon. We believe that no independent lender would have been willing to make such advances. Each partnership owned assets, which produced little if any annual cash flow, and all of the distributable cash flow was allocated to the limited partners. The only means of obtaining repayment of the advances was upon the future sale of the projects at a price in excess of the mortgage and the amount payable to the investors. Don Holland testified that at the time the advances were made, it was impossible to foresee their collection. Under such circumstances, we find that FPI did not intend the advances to be definite obligations payable in all events, but rather it intended to recoup the advance only if the projects were successful. In this respect, FPI's advances are akin to capital contributions. We believe that FPI's purpose in making *212 the advances was to protect its reputation and ability to sponsor and obtain investors in future FHA projects. Whether FPI, Holland, or FPIC was designated as general partner in the various partnership agreements, FPI, as the sponsor of the projects, could not afford to permit any partnership or cooperative to default on its mortgage obligations or on its obligations to the limited partners. Had such a default occurred, the FHA would have refused to do business with FPI in the future, and FPI could not have obtained investors for future projects. In partnerships where Holland or FPIC was the general partner, it is arguable that FPI's advances were made on their behalf as well as for the benefit of FPI. [7]
All the circumstances of this case lead to but one conclusion -- petitioner's advances to the limited partnerships were not bona fide loans. [8] In addition, petitioner's prior experience did not justify the additions that it made to its bad debt reserve in 1975 or 1976. Accordingly, we hold that respondent did *213 not abuse his discretion in disallowing petitioner's additions to its reserve for bad debts. The other issue involved herein arises from facts unconnected with petitioner's deduction for additions to its bad debt reserve. FPI failed to include in its income for 1975 $754,050 of funds which, although belonging to FPI, were deposited in FPIC's bank account. Petitioner conceded prior to trial that it should have reported the funds as its income in 1975, but it seeks to avoid the addition to tax for negligence by showing that the omission was an honest mistake, not an intentional underreporting, and that it reported the $754,050 as income in 1976. With respect to this issue, petitioner bears the burden of proof. Rule 142(a). Although we accept petitioner's allegation that it did not intend to underreport its 1975 income, *214 nevertheless, its omission was due to negligence, within the meaning of section 6653(a). Petitioner employed a certified public accounting firm, and either the accountant, Don Holland or FPI's controller (or all of them) reasonably should have known that FPI was the true owner of the funds and should have reported such funds as income. The unreported amount ($754,050) substantially exceeded the amount ($62,669) reported by petitioner in 1975. That the funds were placed in a bank account owned by FPIC, or that the $754,050 was reported as income in 1976, does not change FPI's 1975 tax liability for such funds. We thus conclude that FPI did not meet its burden of proof and sustain respondent's imposition of the negligence addition. To reflect the foregoing, and the concessions made by petitioner, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and as in effect during the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Don and George Holland are brothers.↩
3. The FHA required a separate legal entity to own each project.↩
4. Don Holland testified that FPI was not the sole general partner for tax reasons, i.e., to avoid the risk that the partnership would be recharacterized as an association taxable as a corporation. FPI, however, was regarded by the investors and the FHA as the entity responsible for the success of each project.↩
5. FPI and FPMI established a reserve for bad debts totalling $50,000 in the fiscal year ended October 31, 1973. This reserve was composed of a $15,000 reserve for FPI and a $35,000 reserve for FPMI. For convenience, hereinafter all references to the reserve will be deemed to be the reserve for FPI and all advances (whether made by FPI or FPMI) will be deemed made solely by FPI. ↩
6. The following is a summary of activities in the bad debt reserve: Overall Reserve
Year
Provision
Write-off
Ending Reserve
10/31/73
$50,000.00
$50,000.00
10/31/74
4,700.00
54,700.00
10/31/75
285,963.00
$90,663.00
250,000.00
10/31/76
240,000.00
490,000.00
The $90,663.00 write-off charged against the bad debt reserve for the fiscal year ended October 31, 1975 consists of the following: ↩
Cordova Gardens
$23,586.00
Crosswood
10,118.00
Redding Co-Op
11,435.00
Rosemont
23,713.00
Stockton Gardens
6,746.00
Tracy Gardens
1,890.00
Woodland Gardens
10,040.00
Subtotal
$87,528.00
Loans to employees
3,135.00
Total write-offs:
$90,663.00
7. Such distributions have the characteristics of a dividend. Since the only taxpayer before us is FPI, we need not decide whether dividend treatment is appropriate.↩
8. Although this finding is dispositive of the principal issue involved herein, we doubt that the advances (assuming they constituted bona fide debt) should be considered worthless as of the close of the taxable years involved, especially in view that they were paid, at least in part, from later sale proceeds. But, we need not, and do not, decide that issue.↩