Robert J. Inness and Yvette Inness v. Commissioner. Bob Inness Company v. Commissioner.
Inness v. Commissioner
Docket Nos. 2076-64, 2102-64, 5572-64.
United States Tax Court
T.C. Memo 1968-120; 1968 Tax Ct. Memo LEXIS 178; 27 T.C.M. (CCH) 567; T.C.M. (RIA) 68120; June 19, 1968. Filed *178 Held, that the income derived from and expenses incurred in a potato-growing-and-selling business were attributable to and reportable by Bob Inness Co. of Montana, Inc., rather than by petitioner Bob Inness Co., a proprietorship electing to be taxed as a corporation under sec. 1361, I.R.C. 1954. [Net operating loss deduction was disallowed.] Held, further, that the advances by petitioner Bob Inness Co. to or on behalf of Bob Inness Co. of Montana, Inc., during 1960, 1961, and 1962 were contributions to capital rather than loans. Held, further, that assessment and collection of the deficiencies involved are not barred by the statute of limitations. William L. Richards, for the petitioners. John W. Dierker, for the respondent. 568 DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in these cases, which have been consolidated for trial and briefing, as follows: Docket No.
Petitioner
Year
Deficiency
2076-64
Robert J. 1960
$ 105.46
Inness and Yvette Inness
2102-64
Bob Inness Company
1960
159.52
5572-64
Bob Inness Company
1958
269.69
1959
2,437.33
1961
1,298.66
1962
6,999.40
The issues presented for decision are: (1) Is the assessment and collection of the deficiencies involved in these cases barred by the statute of limitations? If the assessment and collection is not barred, then the following questions will be presented: *180 (2) Should the petitioner, Bob Inness Co., be allowed to report on its returns for 1961 and 1962 the income and expenses of a farming operation in Montana which the respondent has determined are properly attributable to and reportable by a corporation (not a petitioner herein) known as Bob Inness Co. of Montana, Inc.? If petitioner is so allowed to report, then it will be entitled to net operating loss deductions carried back to 1958 and 1959 which have resulted in refunds to petitioner of taxes paid for those years; a net operating loss deduction carried back to 1960 in respect of which petitioner filed a claim for refund which has not been allowed; and a net operating loss carried forward to 1962, deducted on its return for that year, and disallowed as a deduction by the respondent. Also, if petitioner is so allowed to report, the deficiency determined for the year 1961 will be almost entirely eliminated. (3) In the alternative, if petitioner company is not allowed to report the income and expenses of the farming operations in Montana, then is it entitled to bad debt deductions for 1961 and 1962 for the net amounts which it claims to have advanced to the Montana corporation? *181 No evidence was presented by petitioners respecting numerous other assignments of error made in their petitions, nor were they discussed in petitioners' brief, and accordingly each of the other issues raised in the pleadings will be decided in favor of the respondent because of petitioners' failure to carry their burden of proof. Findings of Fact Some of the facts were stipulated. The stipulated facts are so found and the pertinent facts found in the exhibits attached to the stipulation of facts are incorporated herein by reference. Petitioners Robert J. and Yvette Inness are husband and wife and at the time of filing their petition herein they resided in Dallas, Tex. Bob Inness Co. is an individual proprietorship, of which Robert J. Inness is the sole proprietor, and at the time of filing the petitions herein, the proprietorship's principal place of business was in Dallas, Tex. The Bob Inness Co., during each of the years in issue, elected to be taxed as a domestic corporation under the provisions of section 1361, I.R.C. 1954. The term "petitioner," in the singular, as used hereinafter, will have reference to Bob Inness Co.
Robert J. and Yvette *182 Inness filed their 1960 joint income tax return on or before April 15, 1961, and the statutory notice of deficiency for that year was mailed to them on February 24, 1964. Bob Inness Co. filed its 1960 income tax return on or about March 16, 1961, and the statutory notice for that year was mailed on February 24, 1964. This petitioner filed its returns for 1961 and 1962 on or about April 19, 1962, and March 15, 1963, respectively. The statutory notice with respect to those years was mailed on August 14, 1964. Bob Inness Co. was, upon application, allowed a tentative carryback adjustment from the year 1961 with the result that the sum of $269.69 plus interest was refunded to Bob Inness Co. for the year 1958 and the sum of $2,437.33 plus interest was refunded for the year 1959 - both refunds being made on or about June 12, 1962. The deficiencies determined for the years 1958 and 1959, in the statutory notice dated August 14, 1964, are predicated entirely on the net operating loss carrybacks from 1961, which had been tentatively allowed. Sometime in or about November 1953, Robert J. Inness began the operation of an agricultural commodity brokerage business known as Bob Inness Co. *183 in Dallas, Tex., as a sole proprietor. In that business he purchased potatoes in carload lots and truckload lots from growers in various parts of the country, and then in turn sold 569 the potatoes thus purchased to other parties throughout the country. Both the purchase and sale transactions were carried out over the telephone, and Robert Inness performed no activities in conection with the growing of potatoes. In or about 1955, Robert Inness elected to have the Bob Inness Co. proprietorship taxed as a corporation under the provisions of section 1361 of the 1954 Code; and thereafter and throughout the taxable years, as aforesaid, the proprietorship continued to be so treated. Sometime during 1957 or 1958, Bob Inness Co. modified its method of business operation. At that time, Robert Inness went to Idaho and caused the petitioner to form a joint venture with a potato grower named Charlie Marshall; and Marshall cultivated about one-half of a section of potatoes. During the same period, Robert Inness caused petitioner to form another joint venture with another individual, for the purchase of two cellars of potatoes. Arrangements were made for the packing and shipping of the potatoes *184 from both of these ventures, and they were sold by the petitioner. Thereafter in 1959, Robert Inness returned to Idaho; and, again acting through petitioner, he there leased a warehouse and purchased potato-grading equipment. The petitioner retained the services of a manager for the Idaho operations and had him buy potatoes from growers in the area, pack and ship them to Dallas, where they were sold by the petitioner. Funds required for petitioner's participation in all of the Idaho operations came from petitioner's bank account, and not from a personal bank account maintained by Robert Inness and his wife. These Idaho transactions were recorded in the books and records of the petitioner. Robert Inness terminated petitioner's Idaho operations late in 1959 or early in 1960; and shortly after the termination he, again acting through the petitioner, went into the neighboring State of Montana to engage in potato-growing operations. All of the machinery and equipment and the inventory of potato bags were transferred from Idaho to Deer Lodge, Mont. Petitioner thereafter augmented its assets for conducting operations in Montana by leasing a warehouse and an adjacent shop at Deer Lodge *185 from certain parties who had taken those facilities over from a potato dealer who had gone out of business. Petitioner also purchased from these same individuals all of the potato-grading equipment, vehicles, and farming machinery and tools which had belonged to the dealer. The vehicles so purchased were registered in petitioner's name. Petitioner also made agreements with three different potato growers, pursuant to which petitioner was to furnish the seed and have the seed planted on the growers' land. The growers in turn were to perform the farming operations, and they were to see to the necessary irrigation and the like until the crop reached maturity. Petitioner was to then have the crop harvested and to pay the growers for their services and for the use of their land. The foregoing arrangements were embodied in written contracts signed by the growers and by the petitioner, which were recorded at the Powell County courthouse in Montana. The first crop was planted in the late spring of 1960, and was harvested in the fall of that year. Following the harvesting, the potatoes were placed in storage in the warehouse, and later they were packed and graded during the winter and spring, *186 and finally they were shipped. It was sometime in the summer of 1961 before all transactions relating to that first crop were completed. The Montana operations were to be and were under the actual day-to-day management and direction of an individual named Charles Bragg. Bragg in turn was responsible to Robert Inness. Meanwhile, at an unspecified date prior to June 10, 1960, Robert Inness consulted with an attorney and with the certified public accountant (Wilcox S. Doolittle) who rendered services for the petitioner. The attorney recommended to Inness that he form a corporation to conduct the farming operations in Montana which had been begun, as aforesaid, by petitioner. The attorney's principal reason for advocating the formation of the corporation was to enable Robert Inness to limit his liability for torts growing out of the Montana operations. On June 10, 1960, articles of incorporation in the name of Bob Inness Co. of Montana, Inc., were filed with the secretary of state of the State of Texas; and as of the same date of June 10, 1960, there was issued a certificate of incorporation in the name of Bob Inness Co. of Montana, Inc. (hereinafter called Montana, Inc.). Montana, *187 Inc., as shown in entries on its general journal, purchased from petitioner as of June 1, 1960, furniture, fixtures, and office equipment having a book value of $137.72; automobiles, trucks, and tractors 570 having a book value of $991.66; and potatoprocessing-and-growing equipment having a book value of $8,414.10. Montana, Inc., applied for and was issued an employer's identification number for purposes of reporting amounts withheld from wages paid to employees, as Federal withholding taxes and as employees' shares of taxes under the Federal Insurance Contributions Act. Montana, Inc., filed original and also supplemental Forms 943 (Employer's Annual Tax Return for Agricultural Employees) with the district director at Dallas, Tex., for 1960 and 1961. The following tabulation shows the agricultural wages reported as paid on those returns. *13
Original return
Supplemental return
Year
Amount
Date filed
Amount
Date filed
1960
$ 6,381.70
Jan. 20, 1961
$ 9,490.40
Feb. 9, 1961
1961
24,403.60
Jan. 24, 1962
12,412.31
Feb. 12, 1962
On February 16, 1961, the State of Montana Board of Equalization issued to Montana, Inc., a gasoline tax refund *188 permit. On October 19, 1961, the State of Montana Industrial Accident Board rendered a bill to an insurance agency in Billings, Mont., for services rendered by a physician to one Gene Ronning, who had been injured in an accident on September 26, 1961. On that bill Ronning was shown as an employee of Montana, Inc. On August 30, 1961, Montana, Inc., filed a corporate franchise tax return with the State of Texas, wherein it reported, among other items, sales of $149,367.36, taxable capital of $1,000 (representing no-par-common capital stock), expenses of $170,232.67 and a net loss of $14,515.13. That return was signed and sworn to by Robert J. Inness wherein he represented that he did "solemnly swear that the items entered in the foregoing report * * * are, to my best knowledge and belief * * * true and correct. Regarding expenses incurred and paid in connection with the Montana operations, these were paid by checks drawn on a checking account of the petitioner, either in a bank in Dallas or in a bank in Deer Lodge, Mont. Funds in the Deer Lodge bank account were deposited there by way of transfer from the Dallas bank. Montana, Inc., never opened a bank account in its own name. *189 Disbursements so made from the Dallas bank account were initially recorded in the books of the petitioner. The accountant (the above-mentioned Doolittle) then caused related entries to be made in a set of books which he maintained for Montana, Inc. A typical such related entry on Montana, Inc.'s books would show a debit to an asset or an expense account, and a credit to accounts payable - Bob Inness Co. Those expenses which were paid from the Deer Lodge bank account were recorded directly on Montana, Inc's books of account. The income of the Montana operation was almost entirely derived from the sale of potatoes, and according to the books and records of Montana, Inc., which are in evidence in this case, most of those sales were made to petitioner. The typical entry to record a sale to petitioner would be comprised of a debit to accounts receivable - Bob Inness Co. and a credit to the sales income account. None of the advances made by petitioner to or on behalf of Montana, Inc., was represented by a note or any other instrument of indebtedness. The advances were reflected as an account receivable on the books and records of the petitioner; and, as hereinabove found as a fact, *190 they were reflected as an account payable on the books and records of Montana, Inc. It was the intention of Robert Inness, the proprietor of petitioner, that the advances be repaid to petitioner by Montana, Inc., if that corporation had shown a profit on the Montana operations. The expenses incurred in the Montana operations over the life of Montana, Inc. exceeded the income generated by the Montana operations. Montana, Inc., adopted a fiscal year ending on May 31 for its accounting purposes. On August 16, 1961, Montana, Inc., filed with the district director of internal revenue at Dallas, Tex., a corporation income tax return for the year ended May 31, 1961, on which it reported sales of $149,367.36, cost of goods sold of $156,334.13, other income totaling $6,350.10, and expense deductions of $13,888.54, all of which yielded a reported loss for the 1961 fiscal year of $14,505.13. The balance sheet for the corporation as reflected on schedule L of the return, as of May 31, 1961, was as follows: *13 Assets
Cash
$ 1,261.70
Notes and accounts receivable
850.04
Inventories
600.00
Prepaid rent
2,500.00 571 Buildings
$37,154.74
Less: Depreciation
14,569.12
$22,585.62
Intangible assets
333.45
Less: Amortization
66.69 266.76
Total assets $28,064.12 Liabilities and capital
Accounts payable
$40,393.56
Current liabilities Wages payable
$717.55
FICA tax payable
468.14
1,185.69
Capital stock - common
1,000.00
Earned surplus (deficit)
[1] (14,515.13)
Total liabilities and capital $28,064.12
*191 Montana, Inc.'s above-described Federal income tax return was signed, under penalties of perjury, by Robert J. Inness, as president. Montana, Inc.'s operations continued into the second year; and in the corporation's books and records these operations were unabated at least up through December of 1961. On December 29, 1960, the accountant Doolittle rendered his bill to Montana, Inc., for $250, for the following services performed between August 10 and December 29, 1960: Discussions with Bob Inness and Bill Richards regarding $ 70.00
formation of corporation, study of applicable tax laws
Reviewing applicable Montana State tax laws and their 50.00
effect on corporation
Audit of records from January 1 to May 31 with regard to 50.00
segregation of Montana corporation data for preparation of statements at May 31 (being prepared)
Reviewing Texas, Montana, and federal employment laws 80.00
regarding employment requirements for liability, adjusting payroll records and preparing "claim" for income taxes on "agricultural labor"
$ 250.00
*192 On March 30, 1961, Doolittle rendered his bill to Montana, Inc., for services during the period December 30, 1960, to March 24, 1961: Discussions regarding Montana set-up, helping Mrs. Bennett
$ 50.00 with payroll breakdown of agricultural payroll report
Audit of Montana portion of Dallas records from 6-1-60 to 120.00
12-31-60
$ 170.00
On June 28, 1961, Doolittle rendered his bill to Montana, Inc., for services: Audit of Deer Lodge cash receipts and disbursements from $ 180.00
6-1-60 to 12-31-60
March 30, 1961 statement 170.00
$ 350.00
And, on August 24, 1961, Doolittle rendered yet another bill to Montana, Inc., for services: Discussion and audit of Montana records from 1-1-61 to $ 200.00
5-31-61
Preparing income tax return and statements at 5-31-61 100.00
$ 300.00
Petitioner maintained its books and records and filed Federal corporate income tax returns on the basis of a calendar year. For its calendar year 1960 it filed a Federal income tax return, on March 16, 1961, on which it included none of the income and expenses of the Montana operations for the period after Montana, Inc., had been formed. *193 As hereinabove found as a fact, Montana, Inc., filed a Federal income tax return for its fiscal year ended May 31, 1961, on August 16, 1961. Thereafter, on or about April 28, 1962, it filed an amended return for its 1961 fiscal year, on which it reported no income and no expenses. Appended to that amended return was the following explanation: The reason for amending this income tax return is that this corporation was never perfected legally, and was therefore not authorized legally to do business in Texas or in any other state for the period for which this income tax return was originally filed. The original income tax return was filed in error, and it is now amended to show that there was no business done by this corporation for the period June 1, 1960 to May 31, 1961. On May 1, 1962, which was just 3 days after Montana, Inc.'s amended return for fiscal 1961 had been filed, petitioner filed an amended return for 1960 on which it included the income and expenses of the Montana operations for the period June 1, 1960, through December 31, 1960. Petitioner also filed for its calendar year 1961, a Federal income tax return, on or about April 19, 1962, on which it reported the income *194 and expenses of the Montana operations. No further returns were filed by Montana, Inc., and all income and expenses for operations in Montana continued to be included on petitioner's returns. 572 Montana, Inc., was dissolved on or about June 10, 1962. Respondent, in his statutory notice of deficiency to petitioner in docket No. 5572-64, made the following here pertinent adjustments and gave the following explanations for his action. *13 For calendar year 1961
Unallowable deductions
(a) Loss - Bob Inness Co. of Montana, Inc.
$ 68,103.77
Explanation (a) It has been determined that the loss in the amount of $68,103.77 is not a proper deduction to Bob Inness Co. under (1) the provisions of section 482, or (2) any other provision of the Code. *13 For calendar year 1962
Unallowable deductions
(a) Net operating loss deduc- tion
$52,392.74
Nontaxable income
(e) Income - Bob Inness Co. of Montana, Inc.
9,164.90
Explanation (a) It has been determined that the net operating loss deduction claimed by you in the 1962 Federal income tax return as filed, in the amount of $52,392.74, is not allowable under the internal revenue laws, *195 since it is now held there is no operating loss in the year 1961. (e) It has been determined that you reported on your 1962 Federal income tax return as filed, income from business operations in the amount of $9,164.90, which is properly attributable to Bob Inness Co. of Montana, Inc. Accordingly, your income is reduced in the amount of $9,164.90. Ultimate Findings of Fact The potato-growing-and-selling operations in Montana, described hereinabove in the findings of fact, were conducted by Bob Inness Co. of Montana, Inc., and not by the petitioner Bob Inness Co., from and after June 10, 1960, until the dissolution of Montana, Inc. The net advances made to or on behalf of Bob Inness Co. of Montana, Inc. by petitioner Bob Inness Co., during the period of Montana, Inc.'s existence, are properly to be regarded for Federal income tax purposes as capital contributions to the Montana corporation rather than as loans or as transactions giving rise to an account receivable owing to the petitioner by the Montana corporation. Opinion The threshold question in this case can be quickly disposed of, and, in fact, petitioners do not argue it on brief. Petitioners in the case at each *196 docket have raised the defense of the statute of limitations. Our findings of fact show that the statutory notice in docket No. 2076-64 and that in docket No. 2102-64 were mailed within the 3-year period after the due date of the returns, as provided in section 6501(a) of the 1954 Code. Turning to docket No. 5572-64, where the years 1958, 1959, 1961, and 1962 are involved, the statutory notice insofar as it relates to the years 1961 and 1962 was mailed within the 3-year period provided by section 6501(a) and was thus timely. Insofar as that statutory notice relates to the years 1958 and 1959, the deficiencies therein determined for those years are predicated solely upon the disallowance of net operating loss carrybacks from 1961 which had been tentatively allowed. Under the provisions of section 6501(h), the assessment of the deficiencies for 1958 and 1959 is timely if an assessment for 1961, the year in which the alleged net operating loss occurred, is timely. And we have just pointed out that the statutory notice was timely with respect to the year 1961. We hold, then, that assessment and collection of the deficiencies determined in the three cases here involved is [are] not *197 barred by the statute of limitations. We turn to the principal issue in these cases, which is this: Who should properly have reported the income and expenses of the potato-growing-and-selling business operation in Montana during the period June 1960 through May 1962? Was it petitioner Bob Inness Co., as contended by petitioners? Or was it Bob Inness Co. of Montana, Inc. (Montana, Inc.), as contended by respondent? The question appears to us to be largely factual, and our first finding of ultimate fact is, we believe, dispositive of the issue. After carefully weighing the testimony of Robert Inness, and considering it in the light of the documentary evidence on the point, we have concluded, and found as an ultimate fact, that it was Montana, Inc. Briefly reviewed, that evidence tends to establish that the Montana operations were originally conceived of as being under the aegis of petitioner Bob Inness Co. and from 573 the time they were gotten under way up until about the first of June 1960, they were carried on by that petitioner. However at that point, in order to afford Robert Inness protection from tort liability (if for no other reason), it was decided that the Montana *198 operations should be carried on by a true corporation (instead of by Robert Inness' proprietorship which had only elected to be taxed as a corporation), and a Texas corporation was formed for that purpose, Bob Inness Co. of Montana, Inc. Separate books and records were set up for the corporation. It sought and obtained an employer's identification number for reporting withholding from wages paid to employees. It filed quarterly returns showing wage payments to employees; and it filed a Federal income tax return for its first fiscal year and a Texas corporate franchise tax return for the same period. On each of these returns it reported not inconsiderable amounts of income and expenses; and on balance sheets forming parts of those returns it listed assets and liabilities. Each of these returns was prepared by Wilcox S. Doolittle, the certified public accountant who was one of those who consulted with Robert Inness about the formation of the corporation; and each such return was signed on behalf of the corporation, by Robert Inness as president, under penalties of perjury. There are other indications in the evidence that Montana, Inc., was carrying on the potato business in Montana: *199 it was issued a gasoline tax refund permit by the State of Montana; it was billed several times by the accountant Doolittle for accounting services rendered to it. The State of Montana Industrial Accident Board recognized it as the employer of an employee who was injured in an accident. In one of the leading cases on the point of recognition of a corporation as a separate taxable entity, Moline Properties, Inc. v. Commissioner, 319 U.S. 436, the Supreme Court has given a test to be applied in determining whether a corporation is a separate taxable entity. The Court there said (pp. 438-439): The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * See also *200 National Carbide Corp. v. Commissioner, 336 U.S. 422, where the Supreme Court approved the holding of the Court of Appeals for the Second Circuit that under the Supreme Court's decisions, "when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise" - the corporation, and not its owner, is the taxable entity that must be recognized. Measured by the standards of the Moline Properties case, we think that Bob Inness Co. of Montana, Inc., must be held to be the entity that should properly report the income and expenses of the Montana potatogrowing-and-selling operations involved in this case. Petitioners contend that Montana, Inc., was not a corporation, but even if it be considered a corporation, it was a sham not entitled to recognition for tax purposes. Taking up the contention that Montana, Inc., was not a corporation, we find Texas statutes arrayed rather formidably against that contention. Article 3.04 of the Texas Business Corporation Act (Vol. 3A, Vernon's Ann. Tex. Stat.) provides as follows: Upon *201 the issuance of the certificate of incorporation, the corporate existence shall begin, and such certificate of incorporation shall be conclusive evidence that all conditions precedent required to be performed by the incorporators have been complied with and that the corporation has been incorporated under this Act, except as against the State in a proceeding for involuntary dissolution. * * * The record contains the certificate of incorporation issued by the secretary of state of the State of Texas, as of June 10, 1960, and it appears to us that that 574 circumstance establishes that Montana, Inc., was a valid and existing corporation under the law of Texas. Furthermore, contrary to petitioners' contention, the minute book of the corporation, which was introduced into evidence, indicates that the incorporators of Montana, Inc., did hold an organizational meeting at which they elected officers, adopted bylaws, authorized the opening of and the signatures for a bank account, approved a seal and form of stock certificate for the corporation, and authorized the issuance of 1,000 shares of stock to Bob Inness. While it may be, as Inness testified, that such a meeting was not actually *202 held and that a certificate of stock was not actually issued to him, this is not too unusual in the organization of small closely held corporations, and we do not think this would prevent Montana, Inc., from becoming a viable corporation. See Skarda v. Commissioner, 250 F. 2d 429, affirming 27 T.C. 137. Turning to petitioners' contention that Montana, Inc., was a sham, we must reject that contention for the reasons given above in our review of the evidence leading to our first finding of ultimate fact. That evidence satisfies us that there was a business purpose for the formation of Montana, Inc.; that, at the least, the formation served the personal convenience of Robert Inness, the creator of Montana, Inc.; that it was intended by Robert Inness, that the Montana operation be conducted by that corporation; and that that corporation did in fact thereafter carry on business. We have not been unmindful of petitioners' contention that Montana, Inc., carried on no business activities. However, there is strong documentary evidence that it did carry on business activities and that the Montana operation was carried on in its name until such time as it was realized *203 that it was being operated at a loss. We have been impelled, accordingly, on the evidence in this record, to reject petitioners' contention. See and compare Ernest H. Weigman, 47 T.C. 596, on appeal (C.A. 9). As was said in Skarda v. Commissioner, supra at 434: Where the purpose for creating the corporation is to gain an advantage under the law of the state of incorporation, relieve the stockholders from personal liability for debts created by the corporation, or serve the creator's personal convenience, so long as that purpose is the equivalent of business activity, or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. Where the taxpayer, for business purposes of his own, adopts the corporate form for carrying on a business, the choice of corporate advantage to do business requires acceptance of the tax disadvantages. We decide the principal issue for the respondent, and hold that the income and expenses of the Montana operations were properly attributable to and reportable by Montana, Inc., during the period running from its formation to the time it was dissolved in 1962. We turn to petitioners' *204 alternative contention which they state on brief as follows: "Assuming that Bob Inness Co. of Montana, Inc. was a corporation, the advances by the petitioners were deductible by the petitioners as business bad debts under I.R.C. 166(a), Revenue Act, 1954." Elsewhere in the record, it becomes clear that they seek the claimed bad debt deduction for petitioner Bob Inness Co., and respondent would appear to agree that it is the Bob Inness Co. and not the individual petitioners that is entitled to any deductions that may be found to be proper. This alternative contention was first raised orally by counsel for petitioners in his opening statement, followed by the filing of an amended petition subsequent to the trial. We are somewhat troubled and perplexed by the lack of specificity as to the precise amount claimed as a deduction for each particular year. There are portions of 3 calendar years - 1960, 1961, and 1962 - during which there were operations in Montana conducted by Montana, Inc., and certainly during 1960 and 1961 there were advances made by Bob Inness Co., and presumably, but not certainly, during 1962 such advances were made. Petitioners' contention is phrased in terms of the *205 gross amount of advances, but the evidence establishes that there were repayments of advances from time to time. Hence we have cast the issue in terms of net advances. We do not know for sure what the advances - net or gross - were for each year. Respondent does not, in his brief, raise the foregoing matters which 575 trouble and perplex us. Rather, he pitches his argument on this alternative issue on the lack of a true debtor-creditor relationship, contending that the advances were contributions to capital rather than loans. Although vigorously pressing that argument, respondent nevertheless, and in fairness, makes the following concession on brief: Since Bob Inness Company did suffer a capital loss, it is entitled to offset capital gains during the period in question. For this reason, a Rule 50 computation should be ordered in the event the Court determines the issue favorable to respondent so that proper adjustments may be made for capital gains. In the light of that concession, we shall deal with the issue with a view to determining the character of the advances, i.e., whether they were loans or contributions to capital. *206 Whether or not a particular transaction or series of transactions creates, for Federal income tax purposes, a valid debtorcreditor relationship or are contributions to capital is essentially a question of fact to be determined from all the surrounding facts and circumstances. Joseph W. Hambuechen, 43 T.C. 90, 98, citing Mathiesen v. Commissioner, 194 F. 2d 659, 661 (C.A. 2, 1952). The form of the transaction is not controlling, but rather the substance. Joseph W. Hambuechen, supra.In the last-mentioned case, we pointed out some of the tests to be applied in determining the character of advances. We said (43 T.C. at 99-100): Numerous factors and criteria have been mentioned by this Court as well as other courts which are pertinent to the question whether a debtor-creditor relationship has been established for tax purposes. Such factors as adequacy of the capitalization of the debtor, issuance of any notes, provision for and payment of interest, presence or absence of a maturity date, intention to repay, whether the alleged debt is subordinated to claims of outside creditors, whether outside creditors would have made similar advances *207 under the circumstances, presence or absence of security for the alleged loan, reasonableness of expectation of payment, use to which the funds were put, and whether payment can only be paid out of future profits, are a few of those most frequently mentioned. See Arlington Park Jockey Club v. Sauber, 262 F. 2d 902, 905 (C.A. 7, 1959); Nassau Lens Co. v. Commissioner, 308 F. 2d 39, 47 (C.A. 2, 1962), remanding for other reasons 35 T.C. 268 (1960). It has been aptly stated that "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event." Commissioner v. Meridian & Thirteenth R. Co., 132 F. 2d 182, 186 (C.A. 7, 1942), reversing 44 B.T.A. 865 (1941). Although no one factor by itself is determinative of the question, a significant factor is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture, or were placed at the risk of the business." *208 Gilbert v. Commissioner, 248 F. 2d at 406. Applying those criteria to the facts of the instant case, we find that the capitalization of Montana, Inc., was minimal, $1,000. There were no notes and no provision for payment of interest. There was no maturity date set for the repayment of the advances. The record is silent as to whether the claims of petitioners against Montana, Inc., were subordinated to those of outside creditors. No security was given to petitioners of the alleged loans. Repayment was not confined to future profits of the Montana operations; but Robert Inness candidly testified: "I intended that if the [Montana] operation had shown a profit, that the money advanced would be paid back to the Bob Inness Company in Dallas." After considering and weighing the evidence on this issue, we have concluded and found as an ultimate fact, and we here hold that the advances were contributions to capital. We are satisfied that petitioner Bob Inness Company (acting through Robert Inness) intended to make an investment in and take the risks attendant upon the Montana operations. We decide this alternative issue likewise for the respondent. Decisions will be entered *209 under Rule 50. 576 Footnotes
1. The $10 difference between this figure and the reported loss results from contributions in excess of 5-percent limitation of $10.↩